# FIRST NATIONAL BANK OF SELMA *vs.* COLBY.

[ACTION AGAINST NATIONAL BANK ON CERTIFICATE OF DEPOSIT, COMMENCED
BY ATTACHMENT.]

1. *National banks established by "currency act," how subject to be sued.*
The national banks established under the act of the congress of the
United States called the "currency act," approved June 3, 1864, may
be sued by a creditor of such bank in a State court by attachment.
Stat. at Large, U. S., 1863, 1864, p. 99.

2. *Same; how such suits must be conducted.*—When such suits are so insti-
tuted in the courts of this State they are to be conducted and governed
by the laws of this State, applicable to attachment suits against natural
persons.

3. *National bank, attachment against; for what cause will not be dissolved,
&c.*—Such attachment will not be dissolved, dismissed or abated, or the
levy quashed, because the bank had committed an act of insolvency
before the institution of the suit, and its charter had afterwards been
dissolved and its franchises forfeited, by decree of the United States
district court, and a receiver had been properly appointed to take
charge of the assets of said bank, under said act of congress.

4. *Charge to jury; what not erroneous as to recovery against national bank.*
If the proof on the trial of such a cause shows that the plaintiff had a
proper claim against the bank for a certain sum of money deposited with
the bank by the plaintiff, and the bank on the trial interposes no plea
in defense of the action, it is not error in the court to instruct the
jury, that if they believe the proof, they must find for the plaintiff to the
amount of the claim he has proved, and interest.

APPEAL from the Circuit Court of Dallas.
Tried before Hon. B. L. WHELAN.

The facts are stated in the opinion.

J. C. COMPTON, and CHILTON & THORINGTON, for appellant.
Does the process of attachment lie against this bank under
the circumstances of this case? That is the question to
be first settled.

We say it does not lie for three reasons : 1st. The pro-
ceeding by attachment is statutory, is in derogation of the
common law, and there is no law of Congress or of the

State giving such a remedy against a national bank. Drake on Attach. § 4, p. 7.

It is neither, strictly speaking, a foreign or domestic corporation as contemplated by our statutes, but *sui generis*, and subject to such liabilities and remedies as are provided by the law of its organization.

2. In the second place, no attachment could properly have issued on the 17th day of April, 1867, because the bank, to speak metaphorically, *died the day before.* Its doors were closed, its business forever suspended, its president had absconded, and its assets taken possession of by the government of the United States, all before the attachment issued. There could have been no more unequivocal acts of a surrender of its corporate franchise than was furnished by this bank before the suing out of this attachment. In such case it can not be sued at law. The remedy, ordinarily, is in chancery to husband its assets, that they may be administered as a common fund for the payment of its debts, or as in this case to be summarily administered by the treasury department of the United States in accordance with the law of its creation.—See, as to the right of plaintiff below to sue a dead corporation, *Paschall v. Witsett*, 11 Ala. R.; *Mumma v. The Potomac Company*, 8 Peters, 281.

3. In the third place, no attachment could properly have issued after these acts of utter insolvency on the part of the bank, and the seizure of it by Gen. Swayne, by reason of the 52d section of the act of congress, under which the bank was organized.—13 Statute at Large, 115. That section, taken in connection with section 50, shows conclusively the object and spirit of the law, and that to allow any creditor of the bank, after it was put in liquidation, or after it had "committed an act of insolvency," to acquire a lien by legal proceedings so as to collect his debt in full, leaving even the bill holders and the government, it may be, unprovided for, would be to strike down the act which prescribes specific appropriations of the assets, which establishes equality in the distribution of the entire proceeds, after paying the bill holders in full, and which for-

bids all assignments or transfers of its effects, or payment of monies after such act of insolvency.—See § 52. Surely the law will not do, (give a preference to one of a class whom it declares shall share rateably,) and sanction or create a transfer or assignment to that end, which it expressly declares shall not be made.—See an able opinion, directly in point, in *Venango National Bank v. Taylor,* 56 Penn. 14, 17.

4. Another reason may be stated : There was nothing to levy upon—nothing that could be levied on. The assets were in the hands of Gen. Swayne. His acts were valid. See Ordinance No. 15 of Convention, 1867 ; Acts of 1868, p. 167. The funds were as if in chancery, and not subject to be seized by the sheriff.—*McLemore v. Benbow,* 19 Ala. p. 76 ; *Read v. Sprague,* 31 Ala. 104–5–6.

Suppose the sheriff had attempted to levy on the safe in the vault containing all the assets of the bank. This being in the possession of the secretary of the treasury, through his constituted agent, would have been resisted— must the sheriff summon his *posse* and make war upon the United States forces? Would the law compel, nay, would it for a moment tolerate such a proceeding?" Surely not. And why? Simply because the legally constituted authorities had possession of the assets, and the State courts, then doing business by the sufferance of the power which held the assets, had no right or jurisdiction to interfere. If, then, the personal property of the bank could not have been levied on, how could the sheriff levy on the land? The one, as much as the other, was in the custody of Gen. Swayne for the government.

ALEXANDER WHITE, *contra*—Argued at length, that under the act of congress, neither the contingency had happened which authorized the appointment of a receiver, nor had the facts been brought to the notice of the appointing power in such a manner, as, under the laws incorporating the national bank, would give the power to appoint a receiver ; and further, that admitting the happening of the contingency, and its being properly brought to the notice

of the appointing power, still the power to appoint a receiver had not been followed as prescribed by law, and the appointment was illegal, and that the judgment of the United States district court was void on its face, &c. As this view was not considered in the opinion, it is unnecessary to give the argument more fully.

Mr. WHITE further argued as follows :

By section 57, the bank was liable to be sued in the State courts. Jurisdiction of a corporation, in Alabama, which owed to her laws the exercise of all its corporate functions, without which it could not have made a contract or enforced a right or redressed a wrong, was necessarily implied in the local life of the corporation, but it was not left to intendment or implication, but by the express terms of the organic law of its creation it is liable to "suits, actions and proceedings, &c., in any State, county or municipal court where such bank is located."

There is no restriction as to the kind of suits or the manner of suing, and every remedy and process known to to the courts in which suits may be brought is given as completely, more so, than if each had been enumerated in the acts of congress. For by its unqualified and general terms it embraces suits and remedies which thereafter should be originated in the State where located, as well as those then in being. And it is further implied that such suits, when brought in a local court, shall have the same force and effect they would have against any other person in those courts. The jurisdiction is given without qualification in the enacting grant, and must carry with it all the incidents of that jurisdiction, and the court itself upon which the jurisdiction is conferred, must of necessity regulate and control and adjudicate upon, the rights and remedies of parties litigant in that court. The fact of jurisdiction once properly in exercise, subordinates both subject matter and parties to the orders and judgments and decrees of the court.

It cannot be conceived that a court could discriminate between parties who stood "*in equali juri*" before it.

The attachment must have the same effect in this case as in others like it against any citizen of Alabama.

By express statutory provision, corporations are liable to attachments "in the same manner as if they were natural persons."—Revised Code, § 2942.

This was the law of Alabama at the time of the organization of the First National Bank of Selma, and it was accepted by it as one of the terms of the compact between it and the State in which it was domiciled.

The interpretation, within the jurisdiction of a State, of a local law (or statute) becomes a part of that law as much as if incorporated in it by an act of the legislature.—*Christy v. Pridgeon*, 4 Wallace, 196, 203; *Shelby v. Guy*, 11 Wheat, 362; *Teague v. Eying*, 24 How. 266.

The lien of an attachment is inchoate, dependent upon the party getting a judgment, and when he has obtained his judgment it is then consummated, and he has then a right to satisfaction out of the particular thing levied upon under the attachment.—*Hall v. Cummings*, 3 A. R. 398.

From the time of the levy of the attachment the property was in the custody of the law, and was not subject to levy under any other process.—*Runsdown v. Wilburne*, 6 A. R. 46; *Hagan v. Louis*, 10 Peters, 400; *Pond v. Griffin*, 1 A. R. 678; *Taylor and others v. Carryl*, 20 How. 598; *Case of Oliver Jordan*, 2 Cur. 414.

These were cases of personal property in which replevy bonds had been executed and the property returned to the defendant, but it is obvious that the principle applies with stronger force to lands, which are incapable of replevy and are therefore constructively in the custody of the sheriff till discharged by due course of law.

Where a court has jurisdiction, it has a right to decide any question which occurs in the cause, and when the jurisdiction of the court and the right of the plaintiff to prosecute his suit has once attached, that right cannot be arrested or taken away by proceedings in another suit. *Taylor and others v. Carryl*, 20 How. 596-7; *Peck v. Jenniss*, 7 *ib.* 612.

When concurrent jurisdiction may be exercised by the

federal and State authorities, the court which first takes jurisdiction can be interfered with by no other court, State or federal. It is a subversion of judicial power to take a case from a court having jurisdiction before its final decision is given.—*Ex parte Robinson*, 6 McLean, 355 ; *Ex parte Dorr*, 3 How. 103 ; *Taylor v. Carryl*, 20 How. 583 ; *Shelby v. Bacon*, 10 How. 56 ; *Smith v. McIver*, 9 Wheaton, 532 ; *Holmes v. Remsen*, 20 John. 229 ; *Merrell v. Lake*, 16 Ohio, 373 ; *Payne v. Dowd*, 4 East. 523 ; *Pulliam v. Osborne*, 17 How. 471.

Every country has the right of regulating the transfer of all personal property within its territory.

A State has perfect jurisdiction over all property, personal as well as real, within its territorial limits.—*Green v. Van Buskirk*, 5 Wallace, 312, 313 ; Story on Conflict of Laws, § 390.

The bank is a corporation chartered under an act of congress. It is the law of its organization, and bestows upon it certain qualities of being ; it goes no further. With no more than the attributes conferred by the act of congress, it has no faculty, no capacity of an acting, living thing.

It is an organism capable of life, a body without spirit, a machine without motion, and it is only when it is vitalized by the laws of the State where it locates, as with a coal from the altar, that it has within it the spirit of life.

Without these it cannot buy and hold as owner the house in which it does business, the land whereon it stands, the books in which its records are kept, the paper on which it writes its bills, the counter on which it receives and pays. It can not engage an officer, it can not discount a bill, it can not loan a dollar. It can not acquire a right, it can neither impose or incur an obligation. It can do nothing. It can not claim and assert its right to its franchise but by virtue of the laws of the State of which it is an inhabitant. It is an inert, lifeless thing until the laws of the State breathe into it life.

What is true of natural persons under the law, is also true of artificial persons, so far as their capacities extend.

When the bank became a person in Alabama, in being cherished and sustained by her laws, it became subject to those laws, and the condition of being sued, involved any form of suit and the incidents to those forms which were recognized by the courts of the State.   It was not necessary that the act of congress should make this liability by express enactment.   It would have existed without it.   But when it is given, and given in general and unqualified terms, it implies all that the law confers in any suit brought.

This is the irresistible sequence of the liability imposed on the corporation, and the correlative right conferred on the creditor by the general and unconditional language of the act of congress, and when the right to sue is given, the right to prosecute to judgment in the ordinary modes must continue, unless there is some express prohibitory provision in the law itself.

Any privileges which exempts a corporation from the burthens common to individuals, do not flow necessarily from the charter, but must be expressed in it, or they do not exist.—*Prov. Bank v. Billings & Pittman*, 4 Pet. 514.

Even the bankrupt law, which, by express purpose and enactment, (when it may be said that the chief object of the law is to marshal all the property of the bankrupt for the benefit of all the creditors,) has the effect to stay proceedings or suits against the bankrupt in other courts only by force of positive provision, and that after it has been judicially ascertained that the party is a bankrupt.

By section 14, it is provided that all property of the bankrupt shall pass to the assignee, and attachments taken out within four months before the commencement of the proceedings in bankruptcy shall be dissolved.—*Ib.* 484.

This is positive enactment, and sustains the proposition that it requires positive prohibition by law to arrest proceedings rightfully instituted in a court having jurisdiction of the subject matter and the parties.

When a suit is begun and the defendant is in court, he must plead, answer or demur.

Then the test is, whether the matter set up in bar to the

29

prosecution of this suit is good as a demurrer, or plea.   Is
it in law or in fact, an answer to the complaint which will
preclude the plaintiff from the further prosecution of his
suit?   What is it?   It is that the defendant had commit-
ted "an act of insolvency."   If this is a good plea, then
every act of insolvency by a bank would be a good plea to
any and every suit brought by its creditors against it.   A
refusal to redeem its circulation would be an act of insol-
vency.   To-day, for the purpose of defeating suits against
it by its creditors, it refuses to redeem its circulation ; and
to-morrow it resumes and goes on with its business as
usual.

It will not do to say that it could not do this under the
act, because the prohibition of the act extends only to a
refusal ascertained, and evidenced in a certain way,  and
there are many other acts of insolvency to which it might
resort as a mere subterfuge to delay or avoid suits by its
creditors, which it would be an intolerable perversion to
construe into a defence which should defeat its creditors
or arrest the action of competent courts having jurisdic-
tion.

There is only one other mode by which the action of a
court of competent jurisdiction can be arrested before final
judgment in due course of law, and that is where it is ex-
pressly enacted by law that in certain contingencies the
proceedings in that court may be stayed and another court
shall take jurisdiction of the subject matter of the contro-
versy ; but this must be done by judicial action, by the
solemn judgment of a court, passing upon and adjudicating
the state of facts which authorizes its action, and also
decreeing that action.

PETERS, J.—On the 17th day of April, in the year
1867, the appellee, Colby, commenced an action at law by
attachment against the First National Bank of Selma, for
the sum of forty-eight hundred dollars.   This attachment
was regularly issued from the circuit court of Dallas county,
in this State, and regularly executed by a levy on lands
belonging to said bank, on the day of its issuance.   The

bill of exceptions taken at the trial shows, that said bank ceased to do business on the 16th day of April, 1867, and had, on the 15th day of the same month, refused and failed to pay a draft of the United States for seventy-five thousand dollars. It further appears, that the president of said bank had absconded on the 17th day of April, 1867, and on that day said corporation's house of business and its assets were taken possession of by General Swayne, then commanding the Federal forces in this State, under instructions of the secretary of the treasury of the United States, and upon examination the cash account of said bank was found deficient in the sum of about two hundred thousand dollars. It was also shown that said bank was chartered on the 24th day of August, 1865, under authority of an act of the congress of the United States, entitled "An act to provide a national currency, secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof." This, act was approved June 3, 1864. After the levy of said attachment, viz : on the 1st day of June, in the year 1867, by decree of the district court of the United States for the middle district of Alabama, "all the rights, privileges and franchises of said association derived from the act of congress" were "forfeited," and said association, called the First National bank at Selma, was adjudged to be "dissolved." The record of the proceedings in said district court declaring the forfeiture and dissolution of said charter thereof were given in evidence to the jury on said trial. It was likewise shown that Cornelius Cadle, jr., had been regularly appointed receiver for said association as required by law, on the 3d day of June, 1867. The plaintiff also proved by his certificate of deposit the amount of his deposit in said bank to be the sum for which the attachment had been sued out; that is, forty-eight hundred dollars. This was the substance of all the evidence offered on the trial.

On this evidence, said Cadle, as said receiver, moved the court to dissolve said attachment, and also to quash and discharge the levy of the same on the property of said bank. These motions the court refused ; and said Cadle,

as such receiver as aforesaid, excepted to the ruling of the court thereon.   And thereupon the court charged the jury, that if they believed the evidence, they must find for the plaintiff " the amount of the certificate and interest."   This charge was excepted to by said receiver.   Cadle, as receiver as aforesaid, then asked the court to charge the converse of this proposition ; that is, " if the jury believed all the evidence offered in this cause, they must find for the de-- fendant.   This charge the court refused, and the receiver, Cadle, excepted as before.   There was a verdict and judg-- ment for the plaintiff for $5,632 33 and costs, and a *vendi- tioni exponas* was ordered to issue to the sheriff to sell the property levied on.

I have looked into the act of congress under which the " First National Bank at Selma " was incorporated, and I have not been able to find any express authority there given which would justify a court of law, in which there was a litigation regularly instituted and pending, to dissolve or dismiss an attachment regularly and properly issued and levied on the property of that association, or to discharge the levy so made.   Under the laws of this State, such mo-- tions do not affect the merits of the suit.   They are, then, not matters of right, but only of discretion in the court. Such discretion is not a matter of error on appeal to this court.— *Gill v. Downs,* 26 Ala. Rep. 670 ; *Ex parte Putnam,* 20 Ala. 592.   Under the provisions of the act of congress, the bank has power to " make contracts, sue and be sued, complain and defend in *any court* of law and equity, as fully as natural persons."—U. S. Stat. at Large 1863–64, p. 99 ; 101, § 8.   Then it occupies, so far as these rights are concerned, simply the condition of a citizen.   And it is entitled to the same indulgences and rights that a citizen may claim, and no more.   If the suit is instituted in a State court, as it clearly may be, (8 Wall. 498,) then the law ap-- plicable to the conduct of such suits is applicable to the bank, subject, however, to such modifications as the law of congress may impose.

But the " national currency act," under which the bank at Selma was brought into existence, does not interfere, so

far as I am able to see, in any way with the suit in the State court. Of course, an act of congress made in pursuance of the constitution of the United States, is a part of the supreme law of the land, and a State law must yield to it.—Con. U. S. Art. VI, § 2 ; *Ableman v. Booth*, 21 How. 517, 520. But as the bank may sue and be sued as a natural person, in this State, it may be sued by attachment; because it stands in no better condition than a natural person, and a natural person, in this State, may be sued by attachment.—Rev. Code, §§ 2928–30, 2942. The insolvency of the bank does not dissolve the liability to be sued by attachment. The act does not say so. And it is not to be presumed that congress would interfere with a right so important to the citizen of the State without an express declaration to that effect. It is not a right to be postponed or defeated by a questionable deduction. If it may be interfered with to any extent, in the end it might be paralyzed and destroyed.—*Field v. Close*, 15 Mich. Then the conduct of the suit against the bank is to be judged and determined by our own law in reference to attachments. This does not interfere with or settle the effect or right of the lien under the levy of the attachment. That is not a question that can be raised in this suit in its present shape. No doubt that question is under the control of a jurisdiction where it will be properly determined. Under the law of this State, when an attachment is once properly issued against a corporation, it will not be abated or dismissed because the corporation had, before the issuance of the process, committed an act of insolvency, or because its assets had been placed in the custody of a receiver. The statute of this State governing such suits is as follows : " If the *defendant appear and plead*, the cause proceeds as in suits commenced in the ordinary mode. If he make no defense, the plaintiff may at the trial term take judgment final by *nil dicit*, or default, or execute a writ of inquiry of damages, as may be necessary.—Rev. Code, §§ 3000, 2942. The act of insolvency does not dissolve the liability to be sued, nor the liability to be sued by attachment. The act of congress does not

so declare, nor is it necessary for the purposes of that
statute so to infer it. By the practice of our courts, at-
tachments are only abatable when they have been issued
without affidavit or without bond, as required by law.
Rev. Code, § 2989; 19 Ala. 32. These being the only
causes enumerated, others are excluded by their omission.
And the plea in abatement, as all others, must be made by
"the defendant," and not by a stranger. This is the lan-
guage of the statute above quoted.—Rev. Code, § 3000;
*Kirkman & Rosser vs. Patton*, 19 Ala. 32. And matter of
abatement can not be given in evidence on an issue upon
the merits, a default, or a failure to plead.

No doubt the government could send one of its military
officers to seize upon its own funds deposited in a bank or
elsewhere, when they can be legally reached. But the
officer thus sent could not go farther and seize the prop-
erty of the bank also. His possession as such officer in
the latter case is not the custody of the law which courts
of merely legal jurisdiction will respect, but the custody of
the sword, which courts are not constituted to resist. This
latter custody does not forbid the levy of a proper attach-
ment legally issued. The funds of the United States de-
posited in the bank were not entitled to any lien on the
assets of the bank, until, at least, the assets had passed
into the custody of a receiver, if even then. The govern-
ment had power to secure itself against such loss of its
deposits by the security required to be taken in another
way. The lien on the assets seems to be intended for the
security of the note-holders of the bank, and not for the
deposits.—Act of Congress, *supra*, § 45. It is possible
that the lien of the attachment must give way to the equi-
ties arising under certain sections of the above recited act
of congress, and to the necessities of an administration
and distribution of the assets of the association by the
receiver; but this question does not arise in this case, and
it is not necessary to be decided.—Act Cong. *supra*, §§ 47,
50, 52. Claims against the bank may be such as the re-
ceiver may be unwilling to allow. In such case, they may
be proven to the satisfaction of the receiver, or adjudica-

ted in a court of competent jurisdiction. This could not be, unless the suit could be instituted against the corporation. And for this purpose a State court is competent to adjudicate such claims.—Act of Cong. *supra*, §§ 47, 50, 52, 57 ; *Kennedy v. Gibson et al.*, 8 Wall. 498. For this reason, the doctrine of the case of *Paschall v. Whitsett* does not apply.—11 Ala. 472. In this latter case, the corporation was extinct before the suit was brought.—See Rev. Code, § 1775.

The record does not show that the defendant, said bank, pleaded any plea in defense of said action ; and it appears that the claim of the plaintiff was fully proven. The plaintiff was therefore entitled to his judgment.—Rev. Code, § 3000. There was, then, no error in the action of the court below.

The judgment is affirmed.

[NOTE BY REPORTER.—The foregoing opinion was delivered at the January term, 1870, when Mr. Compton applied for a re-hearing, and filed in support thereof an elaborate argument, the substance of which was as follows :]

1. There is no statute providing for the continuance of actions against corporations created by an act of the congress of the United States after dissolution ; the dissolution of such corporations therefore abates all suits pending at the time of its dissolution.—*Mumma v. Potomac Co.*, 8 Peters, 281 ; *Greely v. Smith*, 3 Story's R. 657.

Since the decision in the case of *Paschall v. Whitsett*, (11 Ala. 472,) the laws of Alabama (Rev. Code, § 1775,) have provided for the continuance of *domestic* corporations for the purpose of winding up the business of such corporations. National banking associations can not be kept alive by State laws for any purpose whatever ; if so, State laws would control federal legislation, and could continue federal laws after they had ceased to exist. An act of congress made in pursuance of the constitution of the United States, is a part of the supreme law of the land,

and State laws which conflict with its provisions must yield.—Const. U. S. Art. VI, § 2; *Ableman v. Booth,* 21 How. 517.

These national banking associations exist alone by virtue of a law of congress; they are a part of the financial system of the nation; they are not dependent upon the comity of any State for the privilege of transacting business within its borders. The general government has a right to establish them in any State.—*McCullough v. State of Maryland,* 4 Wheat. 316.

The laws of Alabama in reference to such associations are precisely the same now as they were when the decision in *Paschall v. Whitsett, supra,* was made. The judgment of the dissolution of the association by the United States district court was rendered before the judgment in the attachment suit. The attachment was therefore dissolved by the extinction of the defendant's corporate existence; if the attachment was at an end, its hold or lien on the property was gone, and the judgment in the attachment suit, and the order directing the issuance of the *venditioni exponas* was erroneous. The fact of the dissolution of the association was established by proof to the court, before the judgment in the attachment suit was rendered.

If, then, there is any authority in law for the prosecution of suits against dissolved national bank associations, it must be found in the act creating them. Section 50 of the Currency Act provides, that claims against such associations in the hands of receivers and in process of settlement, such as the controller of the currency may not consider proved to his satisfaction, may be "adjudicated in a court of competent jurisdiction." If this section is invoked as giving such authority, the party must be bound by all its terms, provisions and purposes.

2. If the plaintiff had the right to proceed with his suit after it was shown to the court that the association had been dissolved by the decree of the United States district court, *it is admitted* that he had the right to have his claim against the association ascertained or determined by the "adjudication of a court of competent jurisdiction" by any

process available for that purpose in such a court, if he had not proved it to the satisfaction of the controller of the currency. He had the right to have the validity of his claim and the amount of it determined; when this was done, the claim was in the condition of those which had been proved to the satisfaction of the controller, and was entitled to receive a ratable dividend with other claims proved or adjudicated, from the assets of the association, after they had been converted into money and paid over to the treasurer of the United States. "The claims of creditors may be proved before the controller, or established by suit against the association. Creditors must seek their remedy through the controller in the mode prescribed by the statute; they can not proceed directly in their own names against the stockholders or debtors of the bank."—*Kennedy v. Gibson et al.*, 8 Wall. 506. Can they proceed against the property of such associations? Beyond the ascertainment of the validity of his claim, and the amount of it, he is not permitted to go, except in violation of section 50 of the currency act.

It is clear that under the general law, aside from the provisions of the currency act, the assets of this insolvent corporation constitute a trust fund or pledge in the hands of its receiver for the equal benefit and security of all note holders, and other creditors of such corporation, and no diligence on the part of a creditor of such corporation could defeat the right of other creditors to a ratable dividend of the funds arising from the assets of such corporation.—*Marr v. Bank of West Tenn.*, 4 Caldwell, p. 471, and cases therein cited; 2 Story's Eq. Jur. § 1252; *Wood v. Dummer*, 3 Mason's R. 308; *Gue v. Tide Water Canal Company*, 24 How. p. 257; *Hightower v. Thornton*, 8 Geo. R. 493.

But section 50 of the currency act has provided a tribunal for the express purpose of giving to creditors of such associations when they become insolvent, a speedy adjustment of its affairs, and a ratable dividend of its assets among all its creditors, excepting the government, which section 47 provides shall have a lien upon all the assets to

re-imburse the government the amount expended by it in redeeming the notes of such associations. After this lien is satisfied, all creditors who have proven their claims as required in the act, or have had them proved by adjudication, are to be paid ratably. The effect of the exercise of the authority given to the controller was, to give him exclusive jurisdiction of the affairs of this association. The terms of section 50 preclude any other hypothesis ; any interference with this authority, except in the manner provided in this act, would be illegal; there would be no end to the embarrassment and conflict which would ensue from such interference. This tribunal has exclusive jurisdiction, and to it all parties must resort. As soon as it was made manifest that the United States, by the controller of its currency, had assumed the administration of the assets of this association, the State court should have discharged the levy of the attachment and given judgment on the proof of the plaintiff's claim in the manner indicated in the act, and analogous to the law respecting judgments against insolvent estates in this State.—Rev. Code, § 2209.

This attempted transfer of the property of the association by its sale under *venditioni exponas* for the purpose of the payment of the claim of plaintiff, to the exclusion of other creditors, is void. "The 50th and 52d sections of the act of Congress of June 3d, 1864, ('banking act,') apply to legal as well as to voluntary transfers by the bank." "The law will not compel a payment or transfer which it prohibits a debtor from making."

From the above quoted decision, it will be seen that the effect of the currency act is to wind up such associations in the same manner as insolvent estates. It seems to be the uniform policy of national and State laws, upon bankruptcy, or the death and insolvency of persons, or corporations, to divide the estate or assets of either, ratably among the creditors, and for this purpose to dissolve attachment liens.—U. S. Bankrupt Act, Insolvent Estates, Revised Code of Alabama. The Code of Alabama nowhere says, that the insolvency of an estate shall dissolve

attachment liens.—See §§ 2062, 2177, 2205, 2206. Yet such insolvency has been uniformly held to have that effect. *Lamar v. Gunter*, 39 Ala. p. 326; *McEachim v. Reid*, 40 Ala. 410.

The strongest term used in the Code in reference to the distribution of such estates is, *ratable payment*, (§ 2206); the language of the Currency Act is, *ratable dividend*.

3. Section 47 of the currency act provides, that the United States shall have a first and paramount lien upon all the assets of such associations, to re-imburse the United States the amount expended in redeeming the circulating notes of such associations. The controller is required by section 50, to make full provision for the payment of the amount so expended before he makes a ratable dividend of the proceeds of the assets; this provision for such payment can only be made by him. If, then, these assets can be taken under attachments before they are converted into money, the controller will be deprived of the means to secure the government the benefit of this paramount lien, and this one tribunal created by the law for the enforcement of the provisions of this act, will have taken from it by the process of a court, one of its most essential powers, and the means to perform one of its plainest duties. This is the effect of the *venditioni exponas* ordered by the circuit court, and it is insisted that such interference is against the spirit and policy, if not letter, of the currency act.

If property, when attached, is subject to a lien *bona fide* placed upon it by the defendant, that a lien must be respected and the attachment postponed to it.—Section 223, Drake on Attachment, and cases cited.

And this rule extends to those created by law.—*Taylor v. The Royal Saxon*, 1 Wallace, jr. 311. In the case of *Peale v. Phipps*, 14 Howard's Rep. p. 375, Taney, C. J., says:

"In the case of *Wiswall v. Simpson's Lessee*, 14 Howard, 52, the court held that where certain lands were in the hands of a receiver, appointed by the chancery court of Alabama, in a case pending before it, they could not be sold by the marshal upon process of execution issuing out

of the circuit court of the United States for that district, although the judgment upon which the process issued, was a lien upon the land, and the execution was laid before the receiver obtained actual possession of the property."

If a receiver had been wrongfully appointed by reason of an alleged refusal of the association to pay its circulating notes, the association could have applied to the nearest United States court, within ten days after receiving notice of the appointment of such special agent, and enjoined further proceedings in the premises.—§ 50, Currency Act.

A modification of the opinion rendered at this term in this cause, is asked to the extent of setting aside the judgment of the circuit court, so far as it authorizes the issuance of a *venditioni exponas*. In this event, the appellee will receive the whole of his debt, if there be assets, and his satisfaction by a rateable dividend, if there be a deficit.

The application was responded to as follows by—

PETERS, J.—The application for rehearing in this case is overruled, with costs. The plaintiff in the court below, who is appellee in this court, was entitled to his judgment in the circuit court. The opinion delivered in this case is not intended to go beyond this, and settle the rights of the parties under the levy of the attachment. If the judgment below was correct, then the plaintiff's rights under the judgment to have it enforced necessarily followed, unless they were defeated by some superior right in favor of the defendant, or some third person.—Revised Code, §§ 2837, 2838, 2868, 2955; *Autrey v. Walters*, June term, 1871. In this case the defendant had no right against the plaintiff which was not settled by the verdict. And in such a suit no third person will be permitted to intervene to defeat the right of the plaintiff to his judgment. This question is sufficiently apparent from the authorities cited in the opinion in the principal case, without further discussion.