# THIRD NATIONAL BANK IN NASHVILLE *v.* IMPAC LIMITED, INC., ET AL.

No. 76–674.   Argued April 26, 1977—Decided June 17, 1977

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, STEWART, MARSHALL, POWELL, and REHNQUIST, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BURGER, C. J., and WHITE, J., joined, *post,* p. 324.

*Thomas P. Kanaday, Jr.,* argued the cause and filed briefs for petitioner.

*Gail P. Pigg* argued the cause and filed a brief for respondents.

MR. JUSTICE STEVENS delivered the opinion of the Court.

A federal statute enacted in 1873 provides that certain

prejudgment writs shall not be issued against national banks by state courts.[1] The question presented by this case is whether that prohibition applies to a preliminary injunction restraining a national bank from holding a private foreclosure sale, pending adjudication of the mortgagor's claim that the loan is not in default. We conclude that the prohibition does not apply.

## I

Only the essentials of the rather complex three-party transaction giving rise to this dispute need be stated. Respondents borrowed $700,000 from petitioner, a national bank, to finance the construction of an office building. The third party, a mortgage company, agreed to provide permanent financing to replace the bank loan upon completion of the building. The loan was secured by a deed of trust, which granted a first lien on respondents' property to the bank while the construction loan was outstanding. A dispute developed between respondents and the long-term lender over whether respondents had satisfied certain preconditions of the long-term loan. Petitioner contends that respondents are in default because of their failure to close the long-term loan. Respondents deny

---

[1] Title 12 U. S. C. § 91, entitled "Transfers by bank and other acts in contemplation of insolvency," now reads as follows:

"All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void; *and no attachment, injunction, or execution, shall be issued against such association or its property before final judgment in any suit, action, or proceeding, in any State, county, or municipal court.*" (Emphasis added.)

that they are in default and contend that petitioner's remedy is against the long-term lender. On September 4, 1975, petitioner notified respondents that foreclosure proceedings would be commenced unless the loan, plus accrued interest and an extension fee, was paid in full in 10 days.

On September 23, 1975, petitioner published a notice of foreclosure. Under Tennessee practice, foreclosure of a deed of trust is not a judicial proceeding, but is routinely consummated by private sale unless restrained by judicial action initiated by the mortgagor. On September 26, 1975, respondents commenced this litigation by filing a sworn complaint in the Chancery Court of Davidson County, Tenn., seeking to restrain the foreclosure on the ground that the loan was not in default. The chancellor ordered the petitioner to show cause why an injunction should not issue.

Petitioner's answer set forth the basis for its claim of default, but did not question the court's power to restrain the foreclosure. Based on the pleadings, the exhibits, and extensive arguments of counsel, the chancellor found "the existence of issues which should be determined upon a full hearing of this cause and that [respondents] would suffer irreparable harm if the foreclosure occurred prior to such full hearing." App. 56. He therefore temporarily enjoined the foreclosure.

Two days later, petitioner filed a supplemental answer alleging that the state court lacked jurisdiction to enter a temporary injunction against a national bank. In due course, the chancellor concluded that 12 U. S. C. § 91 removed his jurisdiction to grant an injunction "prohibiting the foreclosure of property in which the bank has a security interest." App. 69. He therefore dissolved the preliminary injunction, granted an interlocutory appeal, and "stayed" the bank from foreclosure until the appeal to the Tennessee Supreme Court could be perfected.

 The Tennessee Supreme Court reversed. 541 S. W. 2d 139 (1976). It concluded that the federal statute was intended "to

secure the assets of a bank, whether solvent or insolvent, for ratable distribution among its general creditors and to protect national banks in general." *Id.*, at 141. It did not believe this purpose justified an application of the statute when "a debtor of a national bank is seeking, by interlocutory injunction, to protect *his* property from wrongful seizure and foreclosure sale by the bank." *Ibid.* The court acknowledged that the bank had a security interest in respondents' property, but did not believe that the statute was intended to give additional protection to an interest of that kind which was already amply protected.[2] One member of the court read the statute as absolutely forbidding the issuance of any temporary injunction against the national bank before judgment, and therefore reluctantly dissented from what he described as the majority's "just result." *Id.*, at 143. We granted certiorari to decide whether the Tennessee Supreme Court's construction of the statute is consistent with the congressional mandate. 429 U. S. 1037. We affirm.

The critical statutory language reads as follows:

> "[N]o attachment, injunction, or execution, shall be issued against such association or its property before final judgment in any suit, action, or proceeding, in any State, county, or municipal court." 12 U. S. C. § 91.

At least three different interpretations might be placed on that language. Most narrowly, because the rest of § 91 relates

---

[2] "In the instant case, appellee is not using the statute as a shield to protect its assets, but is using it to preclude appellant from protecting its own property. True, appellee has a security interest of $700,000 in the property. However, the property is in the form of an office building allegedly worth in excess of $1,000,000 which cannot be sold, or assigned, or spirited away in the dark of the night so as to defeat appellee's security interest. The Chancellor predicated the temporary injunction (before it was dissolved) upon the condition that appellant continue to pay interest on the $700,000 at the contract rate until a final determination on the merits could be made. In short, appellee's security interest in appellant's property was completely protected." 541 S. W. 2d, at 142.

to insolvency, this language might be limited to cases in which a national bank is insolvent, or at least on the verge of insolvency. Secondly, regardless of the bank's financial circumstances, it might be construed to prohibit any prejudgment seizure of bank assets. Most broadly, it might be given a completely literal reading and applied not merely as a shield for the bank's assets but also as a prohibition against prejudgment orders protecting the assets of third parties, including debtors of the bank.

Although there is support for the narrowest reading in the history of the statute, both that reading and the broadest literal reading have been rejected by this Court's prior cases. Before discussing those cases, we shall review the available information about the origin and revisions of the statute.

II

The National Currency Act of 1864 authorized the formation of national banks.[3] Section 52 of that Act contained the first part of what is now 12 U. S. C. § 91. It prohibited any transfer of bank assets in contemplation of insolvency or with a view to preferring one creditor of the bank over another. The 1864 statute did not, however, include the prohibition against the issuance of prejudgment writs now found in 12 U. S. C. § 91.

That prohibition was enacted in 1873 as § 2 of "An Act to require national Banks to restore their Capital when impaired, and to amend the National-currency Act." 17 Stat. 603. If the prohibition had been added to § 52 of the 1864 Act,[4] the

---

[3] 13 Stat. 99, 100–101. The full title of the statute was "An Act to provide a National Currency, secured by a Pledge of United States Bonds, and to provide for the Circulation and Redemption thereof," but subsequent amendments refer to it as the "National Currency Act." See 17 Stat. 603. The 1864 statute replaced the National Banking Act of 1863, 12 Stat. 665.

[4] The only difference would be that the provision on prejudgment writs would be preceded by the phrase "And provided further, That . . . ."

amended section would have been virtually identical with the present 12 U. S. C. § 91. It was, however, added to § 57 of the 1864 Act, which authorized suits against national banks in the state courts. Petitioner therefore infers that the amendment was intended to qualify the jurisdiction of state courts over national banks and that the amendment should be given its full, literal meaning.

There is no direct evidence of the reason for the amendment. It was passed without debate, Cong. Globe, 42d Cong., 3d Sess., 870, 2117–2118 (1873), and does not seem to have been recommended by the administration.[5] However, the historical context in which the bill was passed may offer some clue as to its purpose. We may take judicial notice of the historical fact that 1873 was the year of a financial panic. Moreover, a number of reported cases involved attachments against national banks and attempts by creditors to obtain a preference by attaching assets of an insolvent bank.[6]

When the first edition of the Revised Statutes of the United States was prepared in 1873, the prohibition against prejudgment writs was combined with the provision concerning preferential transfers and acts in contemplation of insolvency to

---

[5] It was not mentioned in the Reports of the Comptroller of the Currency for 1872 or 1873.

[6] One, First Nat. Bank of Selma v. Colby, 46 Ala. 435 (1871), later reached this Court, 21 Wall. 609. See n. 8, infra. Colby was typical in that it involved an attempt by creditors to obtain a preference by attaching assets of an insolvent bank. This attempt was successful in the Alabama courts, and similar attempts had met with success in New York. See Allen v. Scandinavian Nat. Bank, 46 How. Pr. 71, 82–83 (Sup. Ct., General Term, 1873); Bowen v. First Nat. Bank of Medina, 34 How. Pr. 408 (Sup. Ct., General Term, 1867). See also Cadle v. Tracy, 4 F. Cas. 967 (No. 2,279) (SDNY 1873). Moreover, Bowen and another case, Cooke v. State Nat. Bank of Boston, 50 Barb. 339 (Sup. Ct., Special Term, 1867), raised the possibility that bank assets would be routinely attached by creditors. These cases allowed attachment on the basis that a national bank, wherever it does business, is by definition a "foreign corporation."

form § 5242, which is now 12 U. S. C. § 91.[7]  Respondents argue that this revision placed the provision in the context which was originally intended.

For the past century the prohibition against prejudgment writs has remained in the preferential-transfer section.

## III

This Court has construed this prohibition only three times.[8] In two cases, the Court held that assets of a national bank could not be attached; in the third, the Court held that property of a third party in the custody of the bank was subject to attachment by a creditor.  None of the three involved a preliminary injunction.

Petitioner contends that the earliest of the three, *Pacific Nat. Bank* v. *Mixter,* 124 U. S. 721, "squarely controls" this case.  Brief for Petitioner 13.  Actually, however, the holding in *Mixter* was quite narrow.  The question before the Court was "whether an attachment can issue against a national bank before judgment in a suit begun in the Circuit Court of the United States," 124 U. S., at 724.  Although the statutory prohibition was not directly applicable to federal suits, the federal courts were authorized to issue attachments only as provided by state law.  The Court concluded:

"In our opinion the effect of the act of Congress is to deny the state remedy altogether so far as suits against national banks are concerned, and in this way operates as

---

[7] Section 5242 was included in c. IV entitled "Dissolution and Receivership."  The legislative history is sketched in *Pacific Nat. Bank* v. *Mixter,* 124 U. S. 721, 724–726.

[8] *National Bank* v. *Colby,* 21 Wall. 609, was decided after the passage of the 1873 amendment, but the attachment had been issued before the amendment.  The Court invalidated the attachment without relying on the amendment.  It based its decision, instead, on the ban against preferential transfers and the paramount lien given the United States in the assets of insolvent national banks.  *Id.,* at 613–614.

well on the courts of the United States as on those of the States. Although the provision was evidently made to secure equality among the general creditors in the division of the proceeds of the property of an insolvent bank, its operation is by no means confined to cases of actual or contemplated insolvency. The remedy is taken away altogether and cannot be used under any circumstances." *Id.*, at 727.[9]

The statement in *Mixter* that the remedy of attachment cannot be used against a national bank "under any circumstances" makes it clear that the statutory prohibition is applicable to solvent as well as insolvent national banks. The financial circumstances of the bank are not of controlling importance. That *Mixter* did so hold was settled by this Court's most recent decision concerning this statute, *Van Reed* v. *People's Nat. Bank,* 198 U. S. 554:

> "Since the rendition of that decision [*Mixter*] it has been generally followed as an authoritative construction of the statute holding that no attachment can issue from a state court before judgment against a national bank or its property. It is argued by the plaintiff in error that

---

[9] The Court then added:

"It was further said that if the power of issuing attachments has been taken away from the state courts, so also is the power of issuing injunctions. That is true. While the law as it stood previous to the act of July 12, 1882, 22 Stat. 163, c. 290, § 4, gave the proper state and federal courts concurrent jurisdiction in all ordinary suits against national banks, it was careful to provide that the jurisdiction of the federal courts should be exclusive when relief by attachment or injunction before judgment was sought." 124 U. S., at 727.

This was simply dictum, as no injunction was involved in *Mixter*. Moreover, in *Mixter* the Court was not presented with a situation in which the requested relief related to assets not belonging to the bank. The *Mixter* dictum is therefore not controlling now that "the very point is presented for decision." *Cohens* v. *Virginia,* 6 Wheat. 264, 399. See generally *Barrett* v. *United States,* 423 U. S. 212, 223.

the decision in the *Mixter case, supra,* should be limited to cases where the bank is insolvent; but the statement of facts in that case shows that at the time when the attachment was issued the bank was a going concern and entirely solvent so far as the record discloses. The language of Chief Justice Waite, above quoted, is broad and applicable to all conditions of national banks, whether solvent or insolvent; and there is nothing in the statute, which is likewise specific in its terms, giving the right of foreign attachment as against solvent national banks." *Id.,* at 559 (citations omitted).

Between *Mixter* and *Van Reed,* this Court rendered its only other decision in this area, *Earle* v. *Pennsylvania,* 178 U. S. 449. In that case, the Court held that an "attachment sued out against [a] bank as garnishee is not an attachment against the bank or its property, nor a suit against it, within the meaning of that section." *Id.,* at 454 (emphasis omitted). The holding in *Earle* forecloses a completely literal reading of the statute.[10] It also demonstrates that the "under any circumstances" language in *Mixter* had reference to the financial condition of the bank, rather than to any possible case in which a prejudgment writ issues against a national bank.

Speaking for the Court in *Earle,* the first Mr. Justice Harlan stated that the ban on prejudgment writs must "be construed in connection with the previous parts of the same section" concerning preferential transfers. 178 U. S., at 453. This statement was consistent with the Court's earlier comment in *Mixter:*

"The fact that the amendment of 1873 in relation to attachments and injunctions in state courts was made a

---

[10] In support of its literal reading of the statute, petitioner relies heavily on Mr. Justice Holmes' opinion in *Freeman Mfg. Co.* v. *National Bank of the Republic,* 160 Mass. 398, 35 N. E. 865 (1894); but that opinion preceded *Earle,* in which this Court adopted a contrary approach.

part of § 5242 shows the opinion of the revisers and of Congress that it was germane to the other provision incorporated in that section [concerning preferential transfers], and was intended as an aid to the enforcement of the principle of equality among the creditors of an insolvent bank." 124 U. S., at 726.[11]

Thus, the statute can be given its full intended effect if it is applied to actions by creditors of the bank. As always, "[t]he meaning of particular phrases must be determined in context";[12] read in context, the anti-injunction provision has only a limited scope.[13]

Petitioner argues, however, that the Court erred in *Earle* by reading the anti-attachment and preferential-transfer provisions together. It contends that the two were simply combined by mistake in the Revised Statutes. The burden is on petitioner, we think, to show that the present form of the statute—which, after all, constitutes the legal command of Congress—does not reflect congressional intent. If any mistake occurred, it seems at least as likely that the 1873

---

[11] The Court went on to say that "however that may be," the provision as originally enacted in 1873 completely barred all prejudgment attachments, and "[t]he form of its reenactment in the Revised Statutes does not change its meaning *in this particular.*" 124 U. S., at 726 (emphasis added). After *Earle,* this statement must be read to apply only to attachments against the bank's property.

[12] *SEC* v. *National Securities, Inc.,* 393 U. S. 453, 466; see also *Haggar Co.* v. *Helvering,* 308 U. S. 389, 396.

[13] "The statutory policy seems to be to prevent all preference or priority in claims against these banks sought to be acquired by seizure of effects under State authority before the final adjudication of such claims, and to protect the banks from being weakened or crippled by such antecedent seizures. The national banks created by Congress are to control their own assets and resources, as against State interference at the instance of creditors, or of pretended creditors, until the real existence of the alleged debts has been ascertained by final judgment." *Planters Loan & Sav. Bank* v. *Berry,* 91 Ga. 264, 265, 18 S. E. 137 (1893).

amendment was incorrectly added to § 57 as that the revisers, that very year, made an error which has gone undetected for over a century.[14] But there are three stronger reasons for rejecting the argument.

First, the historical evidence supports the revisers. It appears likely that when originally passed the provision barring prejudgment writs actually was aimed at preventing preferences by creditors. As noted earlier, the threat of insolvency was a serious national problem in 1873, and there had been a number of cases just before in which state courts had allowed creditors to obtain preferences in this manner. There does not seem to have been any similar problem with actions by noncreditors. It seems improbable, for instance, that there were many actions by mortgagors to enjoin foreclosures by national banks, because at that time national banks were allowed to accept mortgages only in very limited circumstances.[15]

Second, the anti-injunction provision itself bears strong signs that it was meant to have a limited scope. It is a familiar principle of statutory construction that words grouped in a list should be given related meaning.[16] The word "injunction" is sandwiched in between the words "attachment" and "execution." Both are writs used by creditors to seize bank property. On the other hand, the word "garnishment"

---

[14] We do not imply that the original reference to § 57 was a typographical error. We merely suggest that the context in which the amendment was originally placed may not have accurately reflected the meaning its draftsmen intended.

[15] It was only much later that national banks were allowed to make loans secured by real estate mortgages. See *First Nat. Bank* v. *Anderson*, 269 U. S. 341, 353–354. National banks were, however, allowed to accept mortgages as "security for debts previously contracted." 13 Stat. 108.

[16] "One hardly need rely on such Latin phrases as *ejusdem generis* and *noscitur a sociis* to reach this obvious conclusion." *United States* v. *Feola*, 420 U. S. 671, 708 (STEWART, J., dissenting).

is conspicuously absent from the list.[17] That writ is directed at the bank, but is used to seize property belonging to others which happens to be in the hands of the bank. The implication is strong that Congress intended only to prevent state judicial action, prior to final judgment, which would have the effect of seizing the bank's property.[18]

Third, petitioner completely fails to identify any national or local interests which its reading of the statute would serve. That reading would give national banks engaged in the business of making loans secured by mortgages on real estate a privilege unavailable to competing lenders. No reason has been advanced for assuming that Congress intended such disparate treatment. We cannot believe that Congress intended to give national banks a license to inflict irreparable injury on others, free from the normal constraints of equitable relief. It is true that Congress has consistently and effectively sought to minimize the risk of insolvency for national banks, and to protect bank creditors from disparate treatment. But those interests are fully vindicated by our construction of the Act.

Even though petitioner's reading of the Act can be supported by its text and by fragments of history, accepted principles of construction require that the provision in ques-

---

[17] Moreover, the provision does not forbid other ways in which a state court might exercise *in rem* jurisdiction over the property of a debtor of the bank, such as a state receivership involving the debtor. Yet such state-court jurisdiction might prevent any other court from exercising *in rem* jurisdiction, as in a judicial proceeding by the bank to judicially foreclose its mortgage. See 1A J. Moore, Federal Practice ¶ 0.214 (2d ed. 1974).

[18] Such uses of injunctions before final judgment were not unknown at the time the statute was passed. For example, creditors were sometimes able to enjoin a transfer of a debtor's property which they alleged to be a fraud on creditors. See *Reubens v. Joel*, 13 N. Y. 488, 492 (1856) (describing New York statute).

tion be construed in its present context and given a rational reading. Fairly read, the statute merely prevents prejudgment seizure of bank property by creditors of the bank. It does not apply to an action by a debtor seeking a preliminary injunction to protect its own property from wrongful foreclosure.

The judgment of the Supreme Court of Tennessee is affirmed.

*It is·so ordered.*

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE and MR. JUSTICE WHITE join, dissenting.

I fear that the Court in this case is driven by sentimentality to reach for what it perceives to be a "just result." In so doing, in my view, it invades the domain of Congress.

The statute provides in unambiguous terms that "no attachment, injunction, or execution, shall be issued against such association or its property before final judgment in any suit, action, or proceeding, in any State, county, or municipal court." 12 U. S. C. § 91. The Court today holds that the statute does not mean what it says: Debtors of a national bank may now obtain injunctions in a state court before final judgment. Perhaps the Court holds, as well, that the statute should apply only to protect banks that are insolvent or nearly so. See *ante,* at 317, 322. But see *ante,* at 315–316, 319, 321. Since the Court rides roughshod over the language of the statute, the legislative history, and a century of consistent interpretation by this Court and others, I cannot join either the Court's opinion or its judgment.

I

At its core, the opinion for the Court rests on a postulated connection between the provision barring prejudgment state writs and certain preceding language of § 91 relating to preferential transfers and acts in contemplation of bankruptcy. From the supposed connection, the Court justifies its

construction that the provision imposes a bar only on the creditors of the bank. Also from this postulated linkage flows the Court's somewhat ambiguous suggestion—one explicitly repudiated in the ·decided cases—that the statute is limited to the context of bank insolvency. The legislative history, however, is clear that the presence of the provision in a section dealing otherwise with bank insolvency is the result of the revisers' accident. No limitation such as the Court today constructs was ever intended by Congress, or, indeed, has ever before been imposed.

The provision at issue was originally enacted in 1873 as an amendment to § 57 of the National Currency Act of 1864. Section 57 originally read:

> "*And be it further enacted,* That suits, actions, and proceedings, against any association under this act, may be had in any circuit, district, or territorial court of the United States held within the district in which such association may be established; or in any state, county, or municipal court in the county or city in which said association is located, having jurisdiction in similar cases: *Provided, however,* That all proceedings to enjoin the comptroller under this act shall be had in a circuit, district, or territorial court of the United States, held in the district in which the association is located." 13 Stat. 116.

And the 1873 amendment to this section provided:

> "That section fifty-seven of said act be amended by adding thereto the following: '*And provided further,* That no attachment, injunction, or execution shall be issued against such association, or its property, before final judgment in any such suit, action, or proceeding in any State, county, or municipal court.' " Act of Mar. 3, 1873, § 2, 17 Stat. 603.

Thus, as originally enacted by the Congress, the provision

had no connection whatsoever with the insolvency of national banks. It was sweeping in scope, barring all writs before final judgment in a state court. It is obvious that the statute in its original 1873 form would require reversal of the decision reviewed today.

As it happened, the amendment of 1873 was separated from the remainder of § 57 in a subsequent compilation of the federal statutes. At the hands of the revisers, the provision barring prejudgment writs found its current resting place as an addendum to what had been § 52 of the National Currency Act of 1864, a section dealing with preferential transfers. Rev. Stat. § 5242 (1874). The Court seizes upon the revisers' accidental reconstruction to limit the amendment's scope. It justifies its action by suggesting that Congress really intended to amend § 52 rather than § 57. The Court states: "If any mistake occurred, it seems at least as likely that the 1873 amendment was incorrectly added to § 57 as that the revisers, that very year, made an error which has gone undetected for over a century." *Ante,* at 321–322. Thus, the Court by sleight-of-hand transforms a simple clerical error into an error made by Congress in the original placement of the amendment. This attempt to refashion the legislative history will not stand scrutiny.

First, although Congress in 1873 could have amended either § 57 or § 52, there is ample internal evidence that the addition of the amendment of § 57 reflects its considered choice. There can be no question, as the Court seems to acknowledge, *ante,* at 322 n. 14, that the reference to § 57 in the 1873 amendment was not a typographical error. The amendment was in *"And provided further"* form; § 57, unlike § 52 of the 1864 statute, already contained one proviso and so the use of "further" was grammatically proper only with respect to § 57. And the broad reading that is compelled by the language of the amendment attaches logically to the other provisions of § 57. The body of § 57 established venue "in

any state, county, or municipal court . . . in which said association is located," and it was natural to place in the very same section any limitation on the power of those courts. Section 57 also contained a limitation on injunctions directed at the Comptroller of the Currency, and it therefore also was natural to place an amendment imposing a related restriction in the same section. In short, there is nothing to suggest that the amendment was placed by Congress in an unintended context.

Second, the Court's confidence in the reliability of the compilation is misplaced. It is hard to believe that the revisers, faced with the task of compiling for the first time the mass of congressional legislation from 1789 to 1873, could have performed the delicate task of determining what Congress "really" intended in adopting the 1873 amendment and of "correcting" its error. It is far more likely that the revisers' "placement" of the provision governing prejudgment writs was just one of the many errors that marred the first compilation. See M. Price & H. Bitner, Effective Legal Research 29 (3d ed. 1969); Dwan & Feidler, The Federal Statutes—Their History and Use, 22 Minn. L. Rev. 1008, 1014 (1938). Indeed the portion of § 57 dealing with venue in state courts was totally omitted in the first edition of the Revised Statutes and was rescued by inclusion in the second edition at the end of a section dealing with usurious interest rates. Act of Feb. 18, 1875, 18 Stat. 320; Rev. Stat. § 5198 (1878). Just as the Court would not, and has not, construed the venue provision established in § 57 as limited to cases involving usurious interest rates,[1] so, too, it should not in good conscience construe the amendment to § 57 as limited to cases involving bank insolvency and preferential transfers.

---

[1] *Radzanower* v. *Touche Ross & Co.*, 426 U. S. 148 (1976); *Mercantile Nat. Bank* v. *Langdeau*, 371 U. S. 555, 558–562 (1963).

## II

If any doubts remain as to the intended scope of the provision, they should be settled by a century of consistent interpretation by this Court and other courts. The Court first construed the statute in 1888 in *Pacific Nat. Bank* v. *Mixter,* 124 U. S. 721. The Court quotes the following sentence from that opinion, *ante,* at 320–321:

> "The fact that the amendment of 1873 in relation to attachments and injunctions in state courts was made a part of § 5242 shows the opinion of the revisers and of Congress that it was germane to the other provision incorporated in that section, and was intended as an aid to the enforcement of the principle of equality among the creditors of an insolvent bank." 124 U. S., at 726.

Since the Court confines its quotation to this solitary sentence, it is able to draw from *Mixter* the proposition that "the statute can be given its full intended effect if it is applied to actions by creditors of the bank." *Ante,* at 321. In its original context, however, the sentence was intended to explain how it happened that the revisers misplaced the amendment and that Congress acquiesced. The sentences *immediately* following the Court's carefully selected single-sentence quotation are:

> "But however that may be, it is clear to our minds that, as it stood originally as part of § 57 after 1873, and as it stands now in the Revised Statutes, it operates as a prohibition upon all attachments against national banks under the authority of the state courts. That was evidently its purpose when first enacted, for then it was part of a section which, while providing for suits in the courts of the United States or of the State, as the plaintiff might elect, declared in express terms that if the suit was begun in a state court no attachment should issue until after judgment. The form of its reenactment

in the Revised Statutes does not change its meaning in this particular. It stands now, as it did originally, as the paramount law of the land that attachments shall not issue from state courts against national banks, and writes into all state attachment laws an exception in favor of national banks. Since the act of 1873 all the attachment laws of the State must be read as if they contained a provision in express terms that they were not to apply to suits against a national bank." 124 U. S., at 726.

As this passage conclusively demonstrates, *Mixter* hardly provides the support the Court attempts to derive from it. And the revisers' error, far from remaining "undetected for over a century," as the Court states, *ante,* at 322, was exposed and overcome in the very first case in which the Court examined the statutory provision. The *Mixter* court gave the provision the broad scope that Congress intended.

The Court next considered the statute in *Earle* v. *Pennsylvania,* 178 U. S. 449 (1900). A national bank was holding a deposit of a customer who happened to be a defendant in an action that otherwise had no connection with the bank. The Court allowed the plaintiff in the action against the defendant-customer to attach the deposit, but only because "an attachment sued out against the bank *as garnishee* is not an attachment against the bank or its property, nor a suit against it, within the meaning of [§ 5242]." *Id.,* at 454. The bank itself had no interest in the fund, and it was immaterial to it whether the deposit was considered the property of the plaintiff or of the defendant. The attachment thus was allowed because the bank was merely a stakeholder. *Earle* offers no suggestion of a distinction between debtors and creditors. In fact, the Court dissolved that portion of the attachment that ordered the sale, subject to the bank's interest, of certain securities the defendant had pledged to the

bank as collateral for a loan. *Id.*, at 455. It is apparent that, unlike the deposit, the bank had an interest in the collateral.

The most recent case, *Van Reed* v. *People's Nat. Bank,* 198 U. S. 554 (1905), is consistent with this unbroken theme. The Court quoted extensively from *Mixter,* and summarized that case's "authoritative construction of the statute" in simple and unambiguous terms: "[N]o attachment can issue from a state court before judgment against a national bank or its property." 198 U. S., at 559. The Court specifically held, in vivid contrast to the intimations of the Court's opinion today, that the provision was not limited to cases in which the solvency of the bank was threatened. *Ibid.*

Not surprisingly, in light of the consistent and expansive interpretation of the statutory provision established by this Court's cases, decisions of other courts are also consistent; they hold with near unanimity that all prejudgment writs issued by state courts and directed at the property of national banks cannot stand. See, *e. g., Robinson* v. *First Nat. Bank of Plainview,* 45 F. 2d 613 (ND Tex. 1930), aff'd on other grounds, 55 F. 2d 209 (CA5 1932); *Garner* v. *Second Nat. Bank,* 66 F. 369 (CC SDNY 1895), appeal dismissed, 79 F. 995 (CA2 1896); *First Nat. Bank* v. *Superior Court,* 240 Cal. App. 2d 109, 49 Cal. Rptr. 358, cert. denied, 385 U. S. 829 (1966); *National Bank of Savannah* v. *Craven,* 147 Ga. 753, 95 S. E. 246 (1918); *Meyer* v. *First Nat. Bank,* 10 Idaho 175, 77 P. 334 (1904); *Chesapeake Bank* v. *First Nat. Bank,* 40 Md. 269 (1874); *Freeman Mfg. Co.* v. *National Bank of the Republic,* 160 Mass. 398, 35 N. E. 865 (1894); [2] *First Nat. Bank* v. *La Due,* 39 Minn. 415, 40 N. W. 367 (1888).

---

[2] The Court suggests that Mr. Justice Holmes' opinion in *Freeman Mfg. Co.* is open to question because it preceded *Earle* and because *Earle* purportedly adopted a "contrary approach." *Ante,* at 320 n. 10. This Court's decision in *Van Reed,* however, which in turn succeeded *Earle,* cited *Freeman Mfg. Co.* with approval as a case that followed the "authoritative

In short, in over a century of the application of the statute by this Court and others, no distinction has been drawn between suits by debtors and suits by creditors, and no limitation to bank insolvency has been imposed. And, of course, Congress' continued acquiescence in this interpretation of the statute only reaffirms the correctness of the long-settled construction.

## III

Even if the legislative history in the cases were less clear, I could not accept the distinction the Court today draws between applications for prejudgment writs by creditors and those by debtors. If the purpose of the provision is to protect the bank's property, no such distinction logically follows. Surely, it must be acknowledged that an injunction interfering with a bank's security interest in mortgaged property is as much an action against its assets as an attachment of its funds or property. And a debtor's injunction directed at a bank's security interest in a building is just as harmful as an attachment of bank property of comparable value by a creditor.[3]

---

construction" of the statute. 198 U. S., at 559. And as to the "contrary approach" of *Earle,* I note that the *Van Reed* Court stated: "We find nothing in the case of *Earle* v. *Pennsylvania,* 178 U. S. 449, which qualifies the decision announced in the *Mixter case.*" 198 U. S., at 559.

[3] Thus the Court's first reason for its construction of the statute, *ante,* at 322—the protection of national banks from insolvency—in fact supports the application of the statute to bar prejudgment state-court writs by both creditors and debtors. The other justifications offered fare no better. The second reason, *ante,* at 322–323—the failure to include garnishment among the prohibited writs—is easily explained by the fact that the seizure of property in which the bank has no interest does not adversely affect it. See *Earle* v. *Pennsylvania,* 178 U. S. 449, 454 (1900). Thus the absence of mention of garnishment hardly justifies a construction that would allow interference with a bank's property by a debtor. The third reason, *ante,* at 323—the alleged absence of an interest supporting the natural reading of the statute—is also easily answered. The statute's obvious purpose

I suspect that the only justification for the Court's decision today is its belief that the statute is unfair in its application. It should be noted in that regard, however, that any unfairness can be traced at least as much to the Tennessee procedure governing foreclosure as to the federal provision barring prejudgment writs in state courts. For if Tennessee law required judicial approval for a foreclosure, any perceived need for the instant preliminary injunction would be eliminated. But even if any unfairness were attributed solely to the federal law, the decision whether to alter the statute remains with the Congress, not with this Court. Since I do not feel free to amend the statute, I respectfully dissent.

---

of protecting the property of a national bank requires that interference with that property by all, both debtors and creditors, be treated alike.