UNITED STATES of America, Plaintiff–Appellee,

v.

David HAYASHI, Defendant–Appellant.

No. 92–10044.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 1992.

Decided Sept. 27, 1993.

Order Amending Opinion on Denial of Rehearing and Rehearing En Banc April 26, 1994.

Alexander Silvert, First Asst. Federal Public Defender, Honolulu, HI, for defendant-appellant.

Edward H. Kubo, Jr., Asst. U.S. Atty., Honolulu, HI, for plaintiff-appellee.

Before: BROWNING, NORRIS, and REINHARDT, Circuit Judges.

Opinion by Judge REINHARDT; Dissent by Judge BROWNING.

Appeal from the United States District Court for the District of Hawaii, Alan C. Kay, District Judge, Presiding.

### ORDER

The opinion and dissent filed on September 27, 1993, are amended as follows: [Editor's Note: Amendments have been incorporated for purposes of publication].

With these amendments, a majority of the panel has voted to deny the appellee's petition for rehearing.

An active judge made a *sua sponte* request to rehear the case en banc. The government also requested en banc rehearing in its response papers. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed.R.App.P. 35.

The petition for rehearing is denied and the suggestion for rehearing en banc is rejected.

### OPINION

REINHARDT, Circuit Judge:

David Hayashi appeals his conviction of taking a marine mammal in violation of 16 U.S.C. § 1372(a)(2)(A). We hold that the Marine Mammal Protection Act (MMPA) and the regulations implementing the act do not

make it a crime to take reasonable steps to deter porpoises from eating fish or bait off a fisherman's line. Therefore, we conclude that insufficient evidence supported Hayashi's conviction, and we reverse.

## I

On the morning of January 24, 1991, Hayashi, a part-time commercial fisherman, and his son were fishing for Ahi off the coast of Waianae, Hawaii. A group of four porpoises began to eat the tuna off Hayashi's and his son's lines. Hoping the impact of the bullets hitting the water would scare the porpoises away from their catch, Hayashi fired two rifle shots into the water behind the porpoises. The shots did not hit the porpoises. When the Hayashis reeled in their lines, they discovered that a porpoise had in fact eaten a part of at least one of the tuna.

A state enforcement officer reported to the National Marine Fisheries Service (NMFS) that occupants of Hayashi's vessel had fired at dolphins. In February 1991, NMFS agents interviewed Hayashi and his son, taking written statements from each. An April 22, 1991 information charged Hayashi with knowingly taking a marine mammal in violation of the MMPA, 16 U.S.C. § 1372(a)(2)(A).

The parties consented to proceed before a magistrate judge. In July 1991, after denying Hayashi's motion to dismiss the information for unconstitutional vagueness, the magistrate judge tried and convicted Hayashi on stipulated facts. The submitted facts consisted of the Hayashis' statements, and an NMFS agent's report and notes on the interviews of the father and son. Hayashi appealed to the district court, renewing his vagueness argument and raising a claim of insufficient evidence. In December 1991, without oral argument, the district court affirmed the conviction by written order. Hayashi appeals on grounds of unconstitutional vagueness and insufficiency of the evidence. We agree that his conviction must be reversed.[1]

## II

The MMPA declares it unlawful for any person to "take" a marine mammal in United States waters. See 16 U.S.C. § 1372(a)(2)(A). "The term 'take' means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13). The MMPA prescribes both civil and criminal penalties, but the latter apply only to persons who "knowingly" violate any provision of the act. See 16 U.S.C. § 1375(b).

The government agrees that the only definition of "take" with possible application to Hayashi is "to harass" or "attempt to harass." The statute itself fails to define "harass." Various agencies of the federal government have promulgated regulations implementing the MMPA.[2] The regulations applicable to porpoises, issued by the NMFS, do not define "harass" but further define "take" as including:

> The collection of dead animals, or parts thereof; the restraint or detention of a marine mammal, no matter how temporary; tagging a marine mammal; the negligent or intentional operation of an aircraft or vessel, or the doing of any other negligent or intentional act which results in disturbing or molesting a marine mammal; and feeding or attempting to feed a marine mammal in the wild.

50 C.F.R. § 216.3.[3] The "disturbing or molesting" example is the only regulatory definition potentially applicable to Hayashi's act of firing a rifle into the water behind a group of porpoises to scare them away from his fishing lines.[4] We conclude that the regula-

---

1. Because we reverse on Hayashi's insufficiency argument, we do not reach his unconstitutional vagueness claim.

2. Both parties agree that administrative regulations clarify the prohibitions in the MMPA.

3. The final "feeding" clause was added to section 216.3 by an amendment effective April 19, 1991. See 56 Fed.Reg. 11,693 (1991) (final rule). The amendment was therefore not in effect, although it had been proposed, when Hayashi committed the charged acts. It was in effect, however, when the information charging Hayashi was filed, and when he was tried.

4. Although this regulatory clause and others include negligent acts, as noted above, only "knowing" violations can support criminal conviction under the MMPA.

tion does not reach the conduct underlying Hayashi's conviction.

## A

Initially, we note that two substantial errors infected the proceedings before the magistrate judge and the district court. First, both parties, the magistrate judge, and the district court all employed the incorrect regulatory definition of the charged crime. Second, the district court's affirmance rested, in part, upon the erroneous belief that negligent acts are criminally punishable under the MMPA.

 In opposing Hayashi's motion to dismiss, the government suggested using the definition of "harass" set forth in 50 C.F.R. § 17.3, "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include ... breeding, feeding, or sheltering." At oral argument, the government did submit for the magistrate judge's consideration the regulatory definition in section 216.3. Nonetheless, in answering Hayashi's appeal to the district court, the government again argued that section 17.3 was the appropriately-controlling regulatory definition. Hayashi acquiesced in and promoted this view.[5]

As a result of the parties' briefing, both the magistrate judge at trial and the district court on appeal employed the regulatory definition in 50 C.F.R. § 17.3, which does not define the crime with which Hayashi was charged.[6] The regulation differs from the definition of "take" in 50 C.F.R. § 216.3, particularly in the former's specific reference to disruption of "feeding." Section 17.3, issued by a different agency in a different federal department from the NMFS, implements an entirely separate statute, the Endangered Species Act.[7] In effect, the district court entirely ignored the appropriate regulatory definition set out in section 216.3. Hayashi's conviction and its affirmance rest upon application of the wrong regulatory definition.[8]

 Consistent with the MMPA criminal penalty scheme, the information charged Hayashi with "knowingly" taking a marine mammal. Under the MMPA, no criminal penalty can attach for negligent conduct. However, in referring the district court to the regulatory definition in section 17.3, which includes negligent acts, the parties failed to inform the court of this statutory requisite of "knowing" conduct for criminal liability to attach. Indeed, in briefing his appeal to the district court, Hayashi argued that the MMPA specifies no mens rea element. In answering Hayashi's brief, the government took no steps to draw the dis-

5. Ignoring its issuance in implementation of a different statute, Hayashi argued that the 17.3 definition controls because it is more specific to the term "harass." However, the "disturbing or molesting" clause in 50 C.F.R. § 216.3 seems most directly applicable to "harass" rather than to the other statutory forms of "take"—hunt, capture, or kill. Therefore, although technically defining "take," the "disturbing or molesting" clause in section 216.3 is logically as specific to "harass" as section 17.3. *Cf.* 56 Fed.Reg. 11,694 (1991) (NMFS) (referring to "disturbing or molesting standard of the current regulation" with regard to definition of "harass" under MMPA).

6. On briefing this appeal, neither party identified 50 C.F.R. § 216.3 as the appropriate regulation. Instead, both relied upon section 17.3. In addition, the government cited, for the first time, 50 C.F.R. § 18.3, which is an MMPA regulation issued by the Fish and Wildlife Service, a separate agency in a different department from the NMFS. Although section 18.3 and 216.3 are nearly identical, section 18.3, by its explicit terms, does not apply to porpoises, but to polar

bears, otters, walrus, and manatees. We eventually ordered supplemental briefing in order to permit the parties to address the proper regulation, section 216.3.

7. This is not to suggest that section 17.3 may not be useful analogous authority. However, even if a regulation implementing a different statute might aid in interpreting those under another statute, the starting point still must be the regulation facially applicable to the statute in question.

8. On supplemental briefing, the government argues that this mistake was not significant because section 17.3 is very similar to section 216.3. Even so, the two sections are facially distinct. Moreover, no level of similarity excuses the government's failure to bring its own facially-applicable regulation to the courts' attention at some point prior to supplemental appellate briefing in response to an order specifically identifying section 216.3.

trict court's attention to 16 U.S.C. § 1375(b), and its explicit "knowledge" requirement.

Apparently unaware of this clear statutory command, the district court, relying upon 50 C.F.R. § 17.3, concluded that a criminal violation of the MMPA could rest upon either negligent or intentional conduct.[9] In addressing Hayashi's insufficiency claim, the district court held that, "[f]iring the rifle in waters containing porpoises was a negligent act that created a likelihood of injury to the porpoises." Although it went on to suggest that the evidence also showed an intentional attempt to stop the porpoises from eating, the district court's erroneous belief that negligence could support an MMPA criminal conviction tainted its consideration of Hayashi's appeal. Thus, Hayashi's conviction and its affirmance rested not only upon an incorrect regulatory definition, but also upon a misunderstanding of the required mens rea.

■ These errors affected the two most basic elements of every criminal proscription—the actus reus, or act itself, and the mens rea, or mental element required for criminal liability. The errors resulted not from a misunderstanding of obscure interpretive gloss, but from a basic misreading of clear statutory and regulatory commands. Although every lawyer involved was complicit in these errors, the responsibility for prosecuting the correct crime lies ultimately with the government.[10]

Under our precedent, if this case had been tried *to a jury* with instructions similarly incorrect as to both the definition of the

crime and its mens rea, we would not hesitate to reverse. *See, e.g., United States v. Washington,* 819 F.2d 221, 226 (9th Cir.1987) ("ambiguous and equivocal" instructions on "basic issue" of level of intent is reversible error); *United States v. Combs,* 762 F.2d 1343, 1346 (9th Cir.1985) (instruction broadening possible basis for conviction "was so lacking in explanation of the offense charged and its elements that it was fundamentally erroneous and inadequate").[11]

Here, we need not determine whether a similar result should obtain in a case tried to a magistrate judge rather than to a jury. Hayashi was tried on stipulated facts; the magistrate judge was not required to resolve any factual disputes or to weigh the credibility of witnesses. We have a clear factual record from which to review Hayashi's conviction, and can do so without further perpetuating the fundamental errors described above. Therefore, cognizant of, but not hindered by, the elemental mistakes that pervaded Hayashi's trial and district court appeal, we consider whether there was sufficient evidence to convict Hayashi of the "knowing taking" of a marine mammal in violation of the MMPA.

**B**

■ As noted above, the government contends that Hayashi committed a criminal "taking" by "harassing" the porpoises; "harass" is left undefined by the statute. *See* 16 U.S.C. § 1362(13). If we look to the administrative regulations, the only form of "tak-

---

9. Although the court relied upon section 17.3, it might well have made the same error even had it resorted to the proper regulation. 50 C.F.R. § 216.3 also includes "negligent or intentional" acts. Only reference to the statute makes clear that criminal "taking" must be "knowing."

10. We are tempted to note the complicity of others not directly represented in these proceedings. Suffice it to say that as the catalog of *federal* crimes expands, we can only expect basic errors stemming from lack of familiarity with individual legal proscriptions to proliferate further.

11. Even when the defendant failed to raise the issue in the district court, we have reversed, holding that an instruction permitting the jury to convict for an uncharged crime is plain error. *See United States v. Vowiell,* 869 F.2d 1264, 1271

(9th Cir.1989) (instruction permitted conviction for harboring when charge was assisting escape). We have excused the failure to raise the issue on appeal as well as in district court. *See United States v. Arrellano,* 812 F.2d 1209, 1211, *modified* 835 F.2d 235 (9th Cir.1987) (erroneous instruction as to required mental state). Finally, we have even reversed when defense counsel affirmatively collaborated in the error. *See United States v. Solis,* 841 F.2d 307, 309 (9th Cir.1988) (instruction on uncharged crime in addition to charged crime is plain error despite defense acquiescence and collaboration). Thus, Hayashi's failure to identify the fundamental errors that infected his conviction would not prevent reversal on those grounds had this case been tried to a jury.

ing" specified in 50 C.F.R. § 216.3 that is potentially applicable to Hayashi's act of firing into the water behind the porpoises to divert them from his fishing lines is the prohibition of any "intentional act which results in disturbing or molesting a marine mammal." However, "disturb" and "molest" are not much more definitive than "harass." All three are very general terms, requiring us to resort to their context to ascertain their meaning.

■ Following the "familiar principle of statutory construction that words grouped in a list should be given related meaning," we look to the other statutory and regulatory examples of "taking." *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322, 97 S.Ct. 2307, 2313, 53 L.Ed.2d 368 (1977). The statute groups "harass" with "hunt," "capture," and "kill" as forms of prohibited "taking." The latter three each involve direct and significant intrusions upon the normal, life-sustaining activities of a marine mammal; killing is a direct and permanent intrusion, while hunting and capturing cause significant disruptions of a marine mammal's natural state. Consistent with these other terms, "harassment," to constitute a "taking" under the MMPA, must entail a similar level of direct intrusion.

Interpreting "harassment" under the MMPA to involve a direct and significant intrusion also comports with a common understanding of the term "take," of which "harass" is simply one form. To "take" a marine mammal strongly suggests a serious diversion of the mammal from its natural routine. Congressional concern in passing the MMPA about marine mammals "in danger of extinction or depletion as a result of man's activities" supports this conception of "take." MMPA § 2(1), Pub.L. No. 92–522, 86 Stat. 1027 (1972) (findings and declaration of policy).[12] Killing, capturing, and hunting fit the common understanding of the term. "Harassment" under the MMPA, to consti-

tute a "taking," must entail a similarly significant level of intrusiveness.

The NMFS regulatory definition of "take," as applied to porpoises, also supports this interpretation. *See* 50 C.F.R. § 216.3. The detention and the tagging of a porpoise are each direct and significant intrusions upon the mammal's ordinary activities. The collection of dead mammals also involves a direct intrusion upon the porpoise in the wild; "collection" suggests sustained activity to locate—or even to facilitate the demise of—deceased or dying marine mammals. The basic purpose of the "collection" prohibition is undoubtedly to deter difficult-to-detect killings of mammals by prohibiting possession of dead mammal by-products. In the context of these other examples, "molesting or disturbing" in 50 C.F.R. § 216.3 must refer to direct and severe disruptions of a porpoise's natural behavior.

The case for our interpretation is even stronger if we refer to 50 C.F.R. § 17.3, the regulatory definition of "harass" urged by the government and upon which the district court exclusively relied. As discussed above, section 17.3, issued under the Endangered Species Act, is not the controlling regulatory definition and is an improper starting point for any MMPA prosecution; it is nonetheless analogous authority that is of considerable assistance in interpreting 50 C.F.R. § 216.-3.[13] Section 17.3 specifically requires significant disruption of "normal" behavioral patterns. Deterrence of abnormal marine mammal activity is not proscribed.

This emphasis upon protecting natural animal behavior comports with the MMPA emphasis upon marine mammals as essential components of the natural marine ecosystem. *See* MMPA § 2(2), Pub.L. 92–522, 86 Stat. 1027 (1972) (marine mammals "should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they

**12.** In describing the need for legislation, the House Report accompanying the MMPA refers to marine mammals that "have been shot, blown up, clubbed to death, run down by boats, poisoned, and exposed to a multitude of other indignities." H.Rep. No. 707, 92d Cong., 1st Sess. (1971), *reprinted in* 1972 U.S.C.C.A.N. 4144, 4144. This list also suggests that the "indigni-

ties" addressed by the MMPA prohibition of "taking" are seriously intrusive acts.

**13.** The NMFS has referred to section 17.3 in interpreting the meaning of "harass" under the MMPA. *See* 56 Fed.Reg. 11,695.

are a part"). The concern that underlies the prohibition against disturbing mammals was for mammals *as a part of nature*, not for mammals acting in ways that endanger human life or property.

Interpreting the act and regulations otherwise, as prohibiting *isolated* interference with *abnormal* marine mammal activity, would lead to absurdity. Under such a broad interpretation, anyone who acted to prevent or in any way interfered with *any* marine mammal activity would face potential criminal prosecution. Nothing could legally be done to save a modern-day Jonah from the devouring whale, or to deter a rampaging polar bear from mauling a child. Neither could a porpoise intent on swimming into severely contaminated waters, or into the propellers of a motorized boat, be diverted by the selfless actions of a good Samaritan. These are but examples of what the unreasonably broad interpretation advocated by the government would lead us to. Our conclusion that only direct and serious disruptions of normal mammal behavior fall under the term "harass" comports with a more reasonable understanding of the extent and scope of the MMPA.[14]

Applying our interpretation to the act for which Hayashi was convicted, we conclude that there was insufficient evidence to find a criminal "taking" by "harassment." The stipulated facts, consisting almost entirely of Hayashi's and his son's statements to the NMFS investigator, show that Hayashi did not fire at the porpoises, nor did he hit them. He simply fired two successive shots behind and outside the area of the porpoises to discourage them from eating bait and hooked tuna from his fishing lines—an act that is not a part of the porpoise's normal eating habits. Even if the shots succeeded in scaring away the porpoises—and the stipulated facts do not tell us whether the porpoises were aware of, or reacted to, the shots—any diversion from eating off the fisherman's lines is not of the significance required for a "taking" under the MMPA. Hayashi's conduct was not the kind of direct, serious disruption of a porpoise's customary pursuits required to find a criminal "taking." Reasonable acts to deter porpoises from eating fish or bait off a fisherman's line are not criminal under the MMPA.[15]

Our conclusion that the MMPA and the regulations implementing the act do not reach Hayashi's act finds further and more specific support in the most recent NMFS amendment of the regulatory definition of "take." Effective April 19, 1991, the NMFS added "feeding or attempting to feed" to section 216.3 as an example of "harassment" under the MMPA. *See* 56 Fed.Reg. 11,693 (1991) (final rule); 55 Fed.Reg. 35,328 (1990) (proposed rule) ("feeding activities may alter the behavior of marine mammals in such a way that they constitute harassment"). One concern motivating the regulatory amendment was the belief that human feeding of marine mammals, primarily dolphins and porpoises, led to potentially dangerous modification of normal feeding behavior. *See* 56 Fed.Reg. at 11,696 ("feeding ... is harmful because it disrupts their natural behavior and normal feeding patterns").

---

14. Although we do not reach Hayashi's vagueness challenge, we note that in the absence of our appropriately restrictive construction of the MMPA and its regulations, "harass" would raise a serious issue of adequate notice to potential violators.

15. What is reasonable will vary with the circumstances. We emphasize, however, that the reasonableness of deterrent steps rests on their impact on the marine mammal alone. For instance, in sentencing Hayashi, the magistrate judge noted that "it's dangerous to be shooting from a boat because there's a lot of other fishermen around and you could ricochet and you're just looking for trouble." From a human safety perspective, Hayashi's act may have been unreasonable, but the MMPA does not address human safety. Conversely, physically clubbing the porpoise with a baseball bat would have been more reasonable from a human safety perspective, but the injury from such a clubbing would almost certainly result in a severe disruption of the porpoise's life activities.

We note that in concluding that the MMPA does not reach certain acts of private fishermen in response to porpoises eating fish off their lines, we work no extraordinary deterioration in porpoise protection. Regulations already afford *commercial* fishermen even more extensive protections from MMPA prosecution. *See* 50 C.F.R. § 229. We afford private fishermen only the lesser protection required by our interpretation of the statute.

In this regard, the NMFS specifically noted that "the dead fish offered to the animals might condition them to seek other dead fish such as those found on baited hooks or in fish nets." *Id.* The Marine Mammal Commission, in commenting favorably upon the proposed rule, noted that feeding may condition animals to approach watercraft "where there is an increased likelihood that they will become entangled in fishing gear, be struck by vessels, or be shot, poisoned, or fed foreign objects." *Id.* at 11,695.

Thus, the regulatory amendment proscribing "feeding" was intended, in the long run, to deter precisely the kind of porpoise behavior that Hayashi witnessed and attempted himself to deter, in the short run, by firing the rifle into the water. It would make little sense for the MMPA to prohibit reasonable private measures to discourage the type of animal behavior that the NMFS has specifically identified as detrimental to marine mammals. The most recent NMFS modification of the regulatory definition of "take" supports our interpretation of the MMPA as not reaching Hayashi's conduct.

Finally, we note the quandary potentially created for one in Hayashi's position were we *not* to hold that the MMPA allows reasonable steps—those not resulting in direct and severe disruption of the mammal's life activities—to deter porpoises from feeding on bait and hooked fish. Allowing porpoises to feed on bait might well run afoul of the "feeding" prohibition in section 216.3 and bring the fisherman to the attention of the vigilant enforcers of our criminal laws.[16] If reasonable steps to divert porpoises from a fishing line were prohibited, the fisherman would face an impossible conundrum. Guilty of "harassment" by "feeding" if he did nothing, and guilty of "harassment" by "disturbing" if he took steps to prevent the feeding, our hypothetical Hayashi would face possible criminal prosecution under the MMPA no matter which course he chose. We do not

believe that Congress or the NMFS intended to create such a "fisherman's dilemma."

## III

We hold that reasonable actions—those not resulting in severe disruption of the mammal's normal routine—to deter porpoises from eating fish or bait off a fishing line are not rendered criminal by the MMPA or its regulations. Because the evidence shows that Hayashi's action was reasonable, we conclude that insufficient evidence supported his conviction. We reverse.

REVERSED.

JAMES R. BROWNING, Circuit Judge, dissenting.

The majority unjustifiably restricts the breadth of the Marine Mammal Protection Act to avoid subjecting Hayashi to a criminal prosecution the majority regards as unreasonable. The gloss imposed by the majority to limit the scope of "taking," a key jurisdictional term in the Act, has no source in the language, structure or legislative history of the Act and derives little support from the various circumstances collected to sustain it. It ignores the structure and purpose of the Act and substantially weakens it as an instrument for effectuating the public policy determined by Congress.

## I

Much more is at stake in defining the statutory term "taking" than Hayashi's freedom to fire his rifle at dolphins to protect a tuna caught by his son. The meaning assigned to this term defines the authority of the Secretary of Interior and the Secretary of Commerce to regulate private and public activities affecting marine mammals.[1] The authority granted the Secretary by the Act to prohibit acts harmful to marine mammals and to develop and encourage means of en-

---

16. Indeed, if it did not, then the dolphin feeding cruises targeted by the NMFS "feeding" amendment could circumvent the new regulatory prohibition by putting the food they use to attract dolphins on hook and line. The same deleterious porpoise behavior modification intended to be prevented by the "feeding" prohibition would

undoubtedly follow from this new form of "fishing" by dolphin feeding cruises.

1. The Act divides duties between the Secretary of Interior and the Secretary of Commerce. 16 U.S.C. § 1362(12). The term "Secretary" refers to both.

suring their survival is keyed directly or indirectly to the concept of "taking." A cramped construction of the term "taking" will therefore restrict most aspects of the scheme envisioned by Congress for the protection of marine mammals, from the monitoring of marine mammal populations to research into more humane fishing techniques.

The references in the Act to the term "taking" confirm its importance. The substantive provisions of the Act open with a moratorium on the "taking and importation of marine mammals and marine mammal products." 16 U.S.C. § 1371(a). The Secretary is authorized to allow exceptions to the moratorium by issuing permits "for taking and importation" of marine mammals, as detailed in the Act. 16 U.S.C. §§ 1371, 1374. What is prohibited and what is permitted are stated in terms of "taking" and will be fixed by the definition of that term. 16 U.S.C. §§ 1372, 1375, 1376. The Secretary's regulatory judgments are to be based upon the past and projected impact of "taking" upon the well-being of the species or stocks and the purposes and policies of the Act. 16 U.S.C. § 1373(a). The Act requires the Secretary to fund research into methods of fishing that minimize the incidental "taking" of marine mammals. 16 U.S.C. §§ 1380, 1381. Vessels receiving exemptions are required to report incidental "taking" of marine mammals, to provide information useful in the study of the effect of certain fishing techniques on marine mammal populations. 16 U.S.C. § 1383a(c), (g). The Act establishes a Marine Mammal Commission, one of whose duties is to conduct a "continuing review ... of humane means of taking marine mammals." 16 U.S.C. § 1402(a)(2).

## II

The scheme of the Act is to define "taking" broadly, thus giving ample scope to the regulatory scheme, and at the same time, to introduce the flexibility that is essential to the effective administration of the Act by authorizing the Secretary to approve particular conduct that would otherwise be prohibited although consistent with the purposes of the Act and required by changing circumstances. The statutory language, the legisla-

tive history, the Secretary's regulations, and the type of conduct approved by the Secretary in the past all point to an interpretation of the jurisdictional term "taking" sufficiently broad to encompass Hayashi's act of deliberately firing his rifle near feeding dolphins to frighten them off.

" 'Take' is defined broadly by the Act...." H.Rep. No. 707, 92nd Cong., 1st Sess. (1971), *reprinted in* 1972 U.S.C.C.A.N. 4144, 4155; *see also* 118 Cong.Rec. 34,639 (Oct. 10, 1972) (comments of Representative Dingell, Committee Chairman and floor manager of the bill). The Act defines "take" as meaning "to harass, hunt, capture, or kill," or attempt to do so. *See* 16 U.S.C. § 1362(13). Congress did not limit the coverage of the statute to the physical destruction or injury of marine mammals. Rather, it sought to regulate a wide variety of human activity potentially harmful to such animals, progressing in severity from "harass" to "hunt," "capture," and finally "kill." 1972 U.S.C.C.A.N. at 4147–48.

Congress found these activities had threatened the survival of marine mammals, although in ways not fully known. As the Committee on Merchant Marine and Fisheries concluded, in these circumstances,

> it seems elementary common sense to the Committee that legislation should be adopted to require that we act conservatively—that no steps should be taken regarding these animals that might prove to be adverse or even irreversible in their effects until more is known. As far as could be done, we have endeavored to build such a conservative bias into the legislation here presented.

*Id.* at 4148. Congress's goal was nothing less than "the *optimum* protection of the marine mammals affected by the bill." *Id.* (emphasis added).

The term "harass" performs the specific function of broadening the definition of "taking" and therefore the Act itself. The House Report highlights the role of "harass" in enlarging the scope of the Act: "The definition of taking ... includes the concept of harassment, and it is intended that this term be construed sufficiently broadly to allow the

regulation of excessive or wanton use of ... chemical compounds, as well as the operation of powerboats." *Id.* at 4150. *See also id.* at 4155; 118 Cong.Rec. 34,639 (Oct. 10, 1972). The Commerce Department objected that the proposed definition of "taking" was overly broad and proposed an alternative that omitted the term "harassment." [2] Congress rejected the proposal. 1972 U.S.C.C.A.N. at 4166–67, 4170. When the Act was amended in 1988, Congress again emphasized that "[t]aking of marine mammals, as defined in the Act, is not limited to capturing or killing them, but includes harassment of the mammals as well." [3] H.Rep. No. 970, 100th Cong., 2nd Sess. (1988), *reprinted in* 1988 U.S.C.C.A.N. 6154, 6158.

Examples of "taking" identified in the legislative history and regulations support a sufficiently broad reading of the term to encompass Hayashi's conduct. Congress identified the "intentional pursuit [of marine mammals] or use of acoustic deterrence devices" as examples of harassment falling within the Act's prohibition. 1988 U.S.C.C.A.N. at 6164. The regulatory explanation of "taking" identifies conduct that is only moderately intrusive and includes the significant catchall "any other negligent or intentional act which results in disturbing or molesting a marine mammal." *See* 50 C.F.R. § 216.3.[4]

The broad scope of "taking" is also reflected in permits routinely issued to authorize conduct no more intrusive than Hayashi's conduct, which in the view of the agency and the applicant nonetheless constitutes "harassment" prohibited under the Act. Permits have been issued identifying as "harassment" but nonetheless authorizing "vessel approach, helicopter photogrammetry and photographic identification," 58 Fed.Reg. 41458 (Aug. 4, 1993); *see also* 58 Fed.Reg. 37716 (July 13, 1993); 58 Fed.Reg. 27270 (May 7, 1993); the broadcast of "underwater acoustic recordings," 57 Fed.Reg. 26649 (June 15, 1992); *see also* 58 Fed.Reg. 7548 (Feb. 8, 1993); and the incidental effects of intrusive studies of marine mammals, 58 Fed. Reg. 29199 (May 19, 1993); *see also* 58 Fed. Reg. 14202 (Mar. 16, 1993).

The examples listed in 50 C.F.R. § 216.3 argue against rather than in favor of the majority's limitation of "taking" to "direct and significant intrusions upon the normal, life-sustaining activities of a marine mammal." (Opinion p. 4158) Under the regulation, a "restraint or detention," "no matter how temporary," qualifies as a "taking," but the majority's proposed standard requires a *"direct and significant* intrusion." "Collection of *dead* animals" does not support the majority's requirement of "direct and significant intrusion on *life-sustaining* activities." "Tagging a marine mammal" cannot be con-

---

**2.** The definition proposed by the Commerce Department was: "The term 'taking' shall mean wounding, capturing or killing or hunting or pursuing with an intent to wound, capture or kill." 1972 U.S.C.C.A.N. at 4170.

**3.** The majority invokes the "familiar principle of statutory construction that words grouped in a list should be given related meaning." *Third Nat'l Bank in Nashville v. Impac, Ltd.,* 432 U.S. 312, 322, 97 S.Ct. 2307, 2313, 53 L.Ed.2d 368 (1977). But the doctrine of *noscitur a sociis* "is not an invariable rule, for [a] word may have a character of its own not to be submerged by its association." *Russell Motor Car Co. v. United States,* 261 U.S. 514, 519, 43 S.Ct. 428, 430, 67 L.Ed. 778 (1923). As noted, "harass, hunt, capture, or kill" suggests that "taking" encompasses a spectrum of conduct involving different degrees of intrusiveness. The term "harass" should not be "submerged" in a monolithic meaning that encompasses only "hunt, capture, or kill." In any event, rules of construction are "used to illuminate the intent of the drafters;

when the rule conflicts with other, clearer indications of intent, its results should be ignored." *Leslie Salt Co. v. United States,* 896 F.2d 354, 359 (9th Cir.1990).

**4.** 50 C.F.R. § 216.3 provides that "taking" includes:

> to harass, hunt, capture, collect, or kill, or attempt to harass, hunt, capture, collect, or kill, any marine mammal. This includes, without limitation, any of the following: The collection of dead animals, or parts thereof; the restraint or detention of a marine mammal, no matter how temporary; tagging a marine mammal; the negligent or intentional operation of an aircraft or vessel, *or the doing of any other negligent or intentional act which results in disturbing or molesting a marine mammal;* and feeding or attempting to feed a marine mammal in the wild.

50 C.F.R. § 216.3 (emphasis added). The concluding clause regarding feeding became effective April 19, 1991, after the conduct involved in this case.

sidered a "significant intrusion on the normal, life-sustaining activities of a marine mammal"; it is a humane means of tracking animals for research, requiring only a minimal intrusion on their activities, life-sustaining or otherwise.[5]

The majority concludes that only disruptions of "normal mammal behavior" are contemplated by the term "harass" and characterizes the porpoises' behavior in this case as "unnatural" or "abnormal marine mammal activity." (Opinion p. 4160) This addition to the definition of the scope of the Act will require courts and regulators to develop a workable system of rules around the elusive concept of "normal marine mammal behavior," a term not mentioned in the Act or its legislative history. Moreover, the porpoises who stole the fish from Hayashi's line were not behaving unnaturally or abnormally. They were merely competing with Hayashi for the same catch. By excluding such behavior from the protection of the Act, the majority frustrates one of the primary purposes of the Act—the protection of marine mammals from harm arising out of human fishing activity.[6] *See* 1972 U.S.C.C.A.N. at 4148 (discussing the harm caused to porpoises by commercial tuna fishing techniques).

### III

Congress included a system of exceptions and exemptions in the Act to enable the Secretary to administer effectively the Act's broad prohibition of activity that might prove harmful to marine mammals. These provisions grant the Secretary the necessary authority to achieve the overall objective of protecting marine mammals while affording reasonable protection to other interests. The statutory structure and the manner in which the Secretary has administered it offer additional, significant support for a broad reading of the jurisdictional term "taking," and specifically for application of the Act to the conduct involved in this case.

The Act bars *all* taking of marine mammals with specified exceptions. 16 U.S.C. § 1371(a). Among other exceptions, "[m]arine mammals may be taken incidentally in the course of commercial fishing operations" under permits issued by the Secretary and subject to conditions specified in the statute.[7] 16 U.S.C. § 1371(a)(2). The Secretary is authorized to waive the general bar against "taking" of marine mammals, and adopt "suitable regulations, issue permits, and make determinations" governing "taking" that are "in accord with sound principles of resource protection and conservation." 16 U.S.C. § 1371(a)(3)(A). *See also* 16 U.S.C. § 1374(a) (authorizing the Secretary to "issue permits which authorize the taking or importation of any marine mammal" subject to specific conditions and in accordance with stipulated procedures).[8]

In the exercise of these powers, the Secretary has from time to time issued regulations dealing with the general problem presented by the facts of this case. A regulation issued in 1980 authorized commercial fishermen in

**5.** The majority also relies on the definition of "taking" in a regulation issued under the Endangered Species Act, specifically, 50 C.F.R. § 17.3. Section 17.3 is of no help to the majority. On its face, the ESA's regulatory definition of the term "harass" as an act that "significantly disrupt[s] normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering" is no more restrictive than the Act's regulatory definition in § 216.3. To the extent § 17.3 is more restrictive than § 216.3, the Secretary was aware of § 17.3, *see* 56 Fed.Reg. 11,693, 11,695 (Mar. 20, 1991), and failed to add similar language to § 216.3.

**6.** In support of its interpretation of the Act, the majority proposes a false "fisherman's dilemma." (Opinion p. 4162–63) Hayashi was not fishing to feed the porpoises, but to feed people, conduct to which the feeding prohibition in 50 C.F.R. § 216.3 does not apply. Indeed, the feeding prohibition is not directed at fishermen. It only regulates "intentional" feeding, and explicitly exempts unintentional, incidental feeding such as the discard of catch by a fishing boat. 56 Fed.Reg. 11,693 (1991).

**7.** Also specifically authorized are "taking" for scientific research and public display under permits issued by the Secretary, 16 U.S.C. 1371(a)(1); and "taking" by Alaskan natives for subsistence and other limited purposes, 16 U.S.C. § 1371(b).

**8.** The Secretary is also authorized to issue general permits to persons whose activities are likely to result in prohibited "takings" for which the Secretary would probably issue a permit if application in advance of each "taking" were possible. 16 U.S.C. § 1374(h).

specified categories to "take such steps as are necessary to protect [their] catch" from marine mammals. 50 C.F.R. § 216.-24(d)(5)(ii). In 1988, Congress added an exemption to the Act under which commercial fishermen in certain fisheries who registered with the Secretary would be exempt from the statutory prohibition against incidental taking of marine mammals until October 1, 1993. *See* 16 U.S.C. § 1383a. The Secretary adopted regulations pursuant to the 1988 exemption permitting such fishermen to "intentionally take marine mammals to protect *catch,* gear, or person during the course of commercial fishing operations," upon securing an exemption certificate or complying with reporting requirements.[9] 50 C.F.R. §§ 229.4(a), 229.6(c)(5), 229.7(d) (emphasis added).

The record indicates that Hayashi was a commercial fisherman and that the conduct underlying his conviction occurred during the period to which the regulations enforcing the 1988 exemption applied. Hayashi did not claim his activities fell within the exemption, however, and the record does not permit a determination of that question. Nonetheless, the existence and substance of the statutory and regulatory exception are significant.

The regulations enforcing the 1988 exemption contradict the majority's conclusion that the Act prohibits only direct and significant intrusions on a marine mammal's life-sustaining activities. The authorization to "take" marine mammals to protect a fisherman's catch is expressly limited to conduct "not expected to cause death or injury to a marine mammal."[10] 50 C.F.R. §§ 229.6(c)(5), 229.-7(d). This limitation makes it clear conduct necessary to protect a catch and not expected to threaten the life of a porpoise was nonetheless included within the statute's prohibition against "taking."

Thus, the commercial fishermen exemption indicates on its face that Hayashi committed a "taking" when he shot at porpoises to protect his catch. The Secretary would not exempt such conduct if it were not prohibited by the Act. In response, the majority effectively extends the exemption to all fishermen:

> We note that in concluding that the MMPA does not reach certain acts of private fishermen in response to porpoises eating fish off their lines, we merely extend to those fishermen some portion of the protections from prosecution afforded *commercial* fishermen confronted by such behavior. *See* 16 U.S.C. § 1383a; 50 C.F.R. § 229.

(Opinion p. 4161 n. 15) The majority does not and cannot argue the specific exemption provided expressly for commercial fishermen can be extended to non-commercial fishermen by interpretation; the majority extends the exemption to non-commercial fishermen simply because it considers such an extension to be reasonable.

The problems with the majority's approach are obvious. It is not within the power of the majority to extend the commercial fishermen exemption to non-commercial fishermen. It is irrelevant that the majority extends to non-commercial fishermen only "some portion of the protections" afforded to commercial fishermen by Congress and the Secretary, or that the protections the majority extends to non-commercial fishermen are moderate and reasonable, if indeed they are.

Although the question was not raised by the parties, there was an obvious reason for Congress to limit the exemption to commercial fishermen. Harassment and killing of dolphins are inevitable in commercial tuna fishing operations. Congress's purpose was to limit the killing and injury of dolphins as far as possible without destroying the tuna fishing industry. The result was a broad prohibition of conduct injurious to porpoises with an exemption for commercial fishing operations under a restraining system of permits and regulations administered by the Secretary. Non-commercial fishing was not exempt from the flat prohibition of conduct

---

**9.** These regulations superseded the 1980 regulations.

**10.** Similarly, the 1980 regulations allowed particular fishermen to take necessary steps to protect their catch "without inflicting death or injury to any marine mammal." 50 C.F.R. § 216.-24(d)(5)(ii).

injurious to marine mammals because non-commercial fishing did not involve a large economic interest Congress wished to protect.

Under Congress's chosen approach, the Secretary is charged with striking the balance between the protection of marine mammals and the economic health of commercial fishing. And with good reason. The Secretary has the expertise and ability to study the effects of commercial fishing techniques on marine mammals and to expand or contract an exemption as new information evolves. Under the majority's approach, an exemption for non-commercial fishing is written into the definition of "taking," and the Secretary is powerless to alter the exemption or impose conditions or limitations upon it.[11] The majority's view is bad policy as well as bad law.

11. Congress's intent in this regard is clear. The 1988 amendment requires holders of exemptions to meet stringent registration and reporting requirements. 16 U.S.C. § 1383a; 1988 U.S.C.C.A.N. at 6154–59.