Lee TEPLEY, Plaintiff,

v.

NATIONAL OCEANIC ATMOSPHERIC ADMINISTRATION, Defendant.

No. C–95–0844 SI.

United States District Court, N.D. California.

Nov. 28, 1995.

Charles G. Miller and Christopher D. Sullivan, Bartko Zankel Tarrant & Miller, San Francisco, CA, for Lee Tepley.

James A. Coda, U.S. Attorney's Office, San Francisco, CA, Michael J. Yamaguchi, U.S. Attorney's Office, Civil Division, San Francisco, CA, James C. Kilbourne, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, Lois J. Schiffer, U.S. Department of Justice, Environment & Natural Resources Division, General Litigation Section, Washington, DC, Lyn Jacobs, U.S. Department of Justice, Wildlife and Marine Resources Section, Washington, DC, for National Oceanic and Atmospheric Administration.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

ILLSTON, District Judge.

On November 3, 1995, the Court heard argument on the plaintiff's motion for summary judgment. Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS the plaintiff's motion.

## I. *FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

On May 10, 1992, plaintiff, Lee Tepley, a free-lance underwater photographer,[1] and a friend, Lisa Costello, went out in his zodiac motor-powered boat off the coast of Hawaii. They spotted a pod of pilot whales swimming in the distance, engaging in an activity known as "porpoising." They proceeded in the direction of the whales. After watching the whales porpoising alongside the boat for some time, Tepley stopped the boat. The whales continued to mill around the area of the boat, "porpoising" and "spy hopping."[2] Costello and Tepley decided to put on their snorkel gear and enter the water with the whales. Apparently, Costello asked Tepley for permission to enter the water, and he gave her his consent. They both entered the water and, as Tepley filmed with an underwater video camera, two or three of the whales began to drift toward Costello. She began to gently touch and pet one or two of them; the whales did not respond to the touching. One of the whales swam away from her, but then turned around, and came back and nipped her on the thigh, spun her around and then released her. Shortly thereafter (how long after is not entirely clear from the record, because the camera stopped for a short time), one of the whales took hold of Costello's ankle in its mouth and brought her down to a depth of approximately forty feet. Tepley's camera was on at this point, and he stated that at first, he did not realize what he was filming. He then saw that it was Costello in the mouth of one of the whales attempting to free herself. About a minute later, the whale brought her to the surface. She was taken to the hospital where she received stitches in her leg. Later, Tepley sold this video to NBC, where it was aired on national television as part of NBC's "I Witness Video" program.

Thereafter, the National Oceanic Atmospheric Administration (NOAA) accused Tepley of "taking" a pilot whale by "harassment" within the meaning of the Marine Mammal Protection Act (MMPA), 16 U.S.C. § 1372(a)(2)(A) and (B) and a regulation thereunder, 50 C.F.R. § 216.11(b). On November 18, 1992, Tepley was charged through a Notice of Violation (NOVA) with

> unlawfully tak[ing] at least one pilot whale (*Globecephala macrophynchus*) a marine mammal, to wit: LEE TEPLEY unlawfully took by harassment one or more pilot whales through operation of a powerboat and subsequent activities in the water.

There were no allegations of, nor was Tepley charged with, injuring the whales in any way.

Tepley was fined ten thousand dollars as a civil penalty. Costello was issued a separate NOVA and was assessed a civil penalty of two thousand dollars; however, her fine was waived and the charges dropped in exchange for her cooperation in the investigation of the incident.

Tepley requested administrative review. After a hearing before an Administrative Law Judge (ALJ) in San Francisco on June 12 and 13, 1993, Tepley was found guilty of harassing the whales. Specifically, the ALJ determined that Tepley had chased the whales and that it was "primarily the chase" of the whales that constituted "sustained and serious disruption of normal marine activity." A.R. at tab 35, p. 7. The ALJ also found, based almost exclusively upon the government's expert witness, Dr. Ridgeway, that Tepley was responsible for the events that occurred underwater because he believed that Tepley's camera may have "emitted a sound" that harassed the whales. *Id.* at p. 8.

---

1. Tepley has a Ph.D. in physics and has been a full time underwater photographer since 1975. Administrative Record ("A.R."), at tab 35, p. 2, n. 1.

2. Spy hopping is behavior whereby a pilot whale partially emerges from the water in a vertical ascending motion.

This finding was based in large part on Dr. Ridgeway's testimony that the whale pulled Costello under water because it was annoyed with her and wanted to remove her from its presence. The ALJ also concluded that Tepley was in control of Costello's actions and thus should be held vicariously liable for her actions. *Id.* at p. 9.

The NOAA subsequently denied discretionary review of the ALJ's decision, stating that "[e]vidence regarding the degree of care or demonstrable harm is irrelevant for purposes of determining whether a violation based upon harassment has occurred"; rather, the question was simply to be determined by whether the behavior of the pilot whales was altered. A.R. at tab 41, p. 2. The NOAA concluded that the ALJ's findings of material fact were "supported by substantial evidence in the record and that no legal or procedural error or abuse of discretion has occurred." *Id.* at 3. On February 9, 1995, by Administrative Order, the decision became final for purposes of judicial review.

Tepley filed this action for judicial review of the NOAA's final decision pursuant to the Administrative Procedures Act, 5 U.S.C. § 551, *et seq.*, in federal district court on March 12, 1995. He now moves for summary judgment overturning the ALJ's decision.

## II. *LEGAL STANDARD*

■ Both parties agree that judicial review of an agency decision is subject to review under the standards set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1988). Unless there is "substantial evidence" in the Administrative Record to support the ALJ's findings, the decision must be rejected as irrational. 5 U.S.C. § 706; *Silverman v. U.S. Dept. of Defense,* 817 F.Supp. 846 (S.D.Cal.1993). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Andrews v. Shalala,* 53

F.3d 1035, 1039 (9th Cir.1995). The court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the agency's decision. *Andrews,* 53 F.3d at 1039. A review for "substantial evidence" is undertaken with "some deference." *Howard v. FAA,* 17 F.3d 1213, 1216 (9th Cir.1994).

The Ninth Circuit considered the definitions of "take" and "harassment" found in 16 U.S.C. § 1372(a)(2)(A) and 50 C.F.R. § 216.3 in *United States v. Hayashi,* 22 F.3d 859 (9th Cir.1993). In *Hayashi,* a commercial fisherman fishing for Ahi fired several rifle shots into the water near some porpoises in an attempt to scare them away from his catch. The fisherman was prosecuted criminally for taking the porpoises by harassment under the MMPA. The court noted that the term "harass" is left undefined by the statute. *Id.* at 863. The court analyzed the term "harassment" in conjunction with the other terms found in the statute ("hunt," "capture" and "kill") and stated the following:

> The latter three each involve *direct and significant intrusions upon the normal life sustaining activities of a marine mammal;* killing is a direct and permanent intrusion, while hunting and capturing cause significant disruptions of a marine mammal's natural state. Consistent with these other terms, "harassment," to constitute a "taking" under the MMPA, must entail a similar level of direct intrusion. *Id.*

(emphasis supplied).

The court set forth a standard for harassment under the MMPA that must refer to a "direct, serious disruption of a [marine mammal's] customary pursuits...." *Id.* The court noted that the primary concern of Congress in enacting the MMPA was to prevent the danger of extinction, depletion of marine mammals, and other "seriously intrusive acts." *Id.* at 864, n. 2. Both plaintiff and defendant agree that the *Hayashi* case is controlling here.[3]

---

**3.** The *Hayashi* case was decided after the events in question occurred, but before a final decision by the ALJ. The parties notified the ALJ of the

decision, and he apparently applied the standard set forth in *Hayashi.*

## III. *INSUFFICIENT EVIDENCE TO SUPPORT AGENCY FINDING*

The government makes two arguments in support of its position that there was sufficient evidence of "harassment" under the MMPA to support the ALJ's findings. First, the government contends that the video footage shot from Tepley's boat, which shows the pilot whales "porpoising," indicates that they were being chased, and thus, harassed. Second, the government argues that the activities that occurred underwater (Costello's contact with the whales and Tepley's photography of them) annoyed the whales and thus constituted harassment.

The Court finds that the Administrative Law Judge relied upon insufficient or speculative evidence to support the conclusion that Tepley's own actions, or the actions of his companion Costello, either in the operation of the boat or underwater, harassed the pilot whales within the meaning of the MMPA. Specifically, this Court finds that the ALJ failed to properly credit the expert testimony presented by Tepley at the hearing.

### A. *OPERATION OF THE BOAT*

A review of the ALJ's decision reveals that he considered the alleged "chase" to be critical to his decision that Tepley harassed the pilot whales. The ALJ stated:

> The actions of Respondent in the case at hand, in chasing the pilot whales for some distance and separately by entering the water with them with his companion to engage in petting, stroking and photography but, *primarily the chase,* constitute "sustained and serious disruption of normal marine mammal activity." (A.R., tab 35 at 7, emphasis supplied.)

In arriving at his conclusion that the operation of the boat constituted harassment, the ALJ relied upon the testimony of the government's expert, Dr. Ridgeway, that the porpoising behavior of the whales indicated that they felt they were being "chased" by the boat.[4] In explaining why the whales did not leave the area after the boat had come to a stop, Dr. Ridgeway testified that if one assumed the whales were being chased, then they could be "more or less tired out."[5]

■ Plaintiff argues, and the Court agrees, that reliance upon this testimony fails to establish the necessary element of causation.[6] Although the porpoising behavior may not be behavior for which pilot whales are known, there is no evidence in the record, nor did Dr. Ridgeway testify, that Tepley's boat actually caused the porpoising behavior to occur. Any finding to the contrary would be the result of pure speculation. Dr. Ridgeway admitted that he did not have any facts indicating whether or not the whales were swimming at the speed and in manner shown on the videotape prior to the approach of Tepley's boat. A.R., tab 42, pp. 142:14–143:4. Accordingly, Tepley argues, and the Court agrees, that the necessary causal link in support of Dr. Ridgeway's conclusion that the whales were fleeing unwanted pursuit is altogether lacking.

In fact, the ALJ's own description of the events does not support his ultimate conclusions about the incident (A.R., tab 35, pp. 2–3):

> The party went approximately four miles, before Respondent, who was "spotting" at this time, noticed a "disturbance," in the form of splashing in the water in the distance. (Tr. 227 and Resp.Ex. L). He directed Ms. Costello, who was operating the boat, at a reasonably high speed, to head in the direction of the splashing. (Tr. 228). She saw the pilot whales in the distance and directed the boat in their

---

**4.** "Q: What does the porpoising at the beginning suggest to you? A [Ridgeway]: Well, it would suggest the possibility to me that they may have been chased or were fleeing from something." A.R., tab 42, p. 120.

**5.** "Q: In the video, what does the milling of the whales after the vessel stopped suggest to you? A [Ridgeway]: Well, to me it suggests if you start off with the assumption that they may, that they were being pursued, it suggests that they more or

less tired out and tired of being pursued and running, and so they simply mill up." A.R., tab 42, p. 121.

**6.** At oral argument, counsel for the government stated that if Tepley had simply pursued the whales, this would be insufficient to support a finding of harassment; the chase must actually have caused the whales to flee.

direction. (Tr. 166). After approximately twenty minutes of running the boat at high speed, the party caught up to the whales who were "porpoising" and "swimming very fast." (*Id.* and Agency Ex. 4). Ms. Costello drove the boat "right alongside" of the whales and paralleled the group. (Tr. 167 and Agency Ex. 4). The whales started towards the boat and began "riding the waves" and "porpoising." (Tr. 230). After a while, Respondent noticed several whales slow and fall behind the boat. (Tr. 231) Ms. Costello slowed the boat and came to stop. The whales turned and meandered toward the boat, milling around and "spy hopping." (*Id.*)

The ALJ's description of the events does not indicate a "chase," but rather that Tepley's boat drove alongside the whales, and that they ultimately approached his boat. This characterization of the events in question does not support a finding of "harassment" within the meaning of the statute.

Moreover, the NOAA's own investigator, Agent Sautter, concluded that the videotaped footage of the whales did not show any whales changing their course to get away from the boat. A.R., tab 42, p. 84.

Finally, Tepley and Costello (the only actual witnesses to the event) testified that the whales were porpoising when they first spotted the whales and that the whales ultimately approached their boat. Tepley also provided a videotape of other pilot whales engaging in porpoising activity, without the presence of humans nearby. He also presented testimony from other individuals with many years of experience observing pilot whales and other marine mammals.[7] These individuals supported his position that the ALJ erred in concluding that the porpoising activity is conclusive proof that Tepley's actions severely disrupted the whales' regular behavior within the meaning of *Hayashi.* There is no substantial evidence that the whales were being chased and that they were attempting to get away from the boat, particularly since when Tepley stopped the boat, the whales milled around the boat, rather than leaving the area.[8]

## B. *NO SUBSTANTIAL EVIDENCE THAT THE UNDERWATER ACTIVITIES CONSTITUTED HARASSMENT*

■ Tepley argues that the ALJ's finding that he harassed the whales by his and Costello's contact with the whales underwater rests upon two foundations: 1) alleged harassment resulting from a sound that the ALJ found was made by Tepley's camera; and 2) Dr. Ridgeway's opinion that the whale's behavior indicated "annoyance at the humans' presence." A.R., tab 35, at p. 7. As to this first finding, plaintiff argues that there was *no evidence whatsoever* of any noise emitted from Tepley's camera. The testimony relied upon by the ALJ in support of this finding was from Dr. Ridgeway, who

---

7. Tepley presented testimony by four witnesses who were qualified as experts by the ALJ: James Watt, Michael Bailey, Kim Sweeney and Ken Balcomb. Tepley argues that the ALJ erred by improperly discounting his expert testimony. The ALJ found the government's expert to have "outstanding credentials" and found that plaintiff's experts did not have "significant education backgrounds regarding either the field of science or marine biology." The ALJ stated: "[W]hile Respondent's experts have viewed pilot whales in the wild and noticed their behaviors, Respondent's experts have never observed pilot whales in the wild for purposes of determining what their normal behavior is." The ALJ went on to say, "while this tribunal recognizes that exposure to marine mammals, may qualify someone as an expert on their behavior, I find that where an expert has extensive exposure as well as educational background, that expert is better able to testify to the habits of these creatures." Since this case involved almost exclusively "viewing pilot whales in the wild and notic[ing] their behavior," it does appear that the ALJ failed to give adequate consideration to the testimony of plaintiff's experts Watt, Bailey, Sweeney and Balcomb.

8. The ALJ's conclusion that the whales stopped because they were tired, similarly finds little support in the record. Dr. Tepley testified, and the videotape supports his testimony, that the whales were "still very active" once he stopped his boat. The ALJ's conclusion is based entirely on the testimony of Dr. Ridgeway, which is speculative at best. It appears that the ALJ compared Dr. Tepley's actions to that of a "drive fishery," an activity involving many boats encircling whales while banging on pipes in the water. The Court is not persuaded by this analogy and finds the drive fishery activities substantially and qualitatively different from the activities here.

stated that Tepley "did have a camera that was—apparently making some sound." A.R., tab 42, p 147. There is simply nothing in the record to indicate whether the camera actually made any sound, and if it did, whether it played any part in the alleged "harassment." Even if the camera did "make some sound," a finding that the noise from a camera alone constitutes harassment finds no support in the law. If Congress wanted to enact a regulation that prohibits filming of animals in the wild, or that establishes distance requirements, it easily could have done so. Such a new rule would, as Tepley points out, require a notice and comment period pursuant to the Administrative Procedures Act. In any event, the videotaping of whales alone does not rise to the level of harassment. Moreover, the Agency itself declared that swimming in the water and filming whales alone is not a violation of the MMPA. A.R., tab 42, pp. 45–46, 38. The ALJ also stated that "[u]nderwater photography of marine mammals, is not per se preempted by the result in this case." A.R., tab 35, p. 10.

■ In support of his arguments that the ALJ's decision was not supported by substantial evidence, Tepley argues that it was error to hold him liable for Costello's actions. Assuming for these purposes that Tepley could be held vicariously liable for the actions of Lisa Costello, this Court nevertheless finds that her actions do not rise to the level of a "direct and severe disruption of the [whale's] natural behavior patterns" within the meaning of *Hayashi, supra* at 863. There is not substantial evidence in the record to support a finding that plaintiff's actions, in the circumstances that are present here, constituted harassment given that the Ninth Circuit has found that firing rifle shots at porpoises to scare them away from a fisherman's lines is not harassment. There is no evidence that Ms. Costello and Dr.

Tepley's actions were anything but gentle. The whale's responses could have been playful, or, as the government suggests, could have been the result of agitation. The Court is not persuaded that there is substantial evidence to support the government's characterization of this incident as an angry whale attack.

More importantly, it would be quite a difficult endeavor for any trier of fact to determine what significance should be attributed to the actions of the whales. To quote the government, such "anthropomorphic rationalization" cannot be the basis for the severe penalty that was imposed here; yet, the ALJ's findings centered on his evaluation of the "whales' annoyance at the humans [sic] presence." A.R., tab 35, p. 8. The Court in *Hayashi* did not engage in speculation about possible reasons for the particular reactions of the mammals, or about their emotional states. In fact, the stipulated facts in *Hayashi* did not indicate "whether the porpoises were aware of, or reacted to, the shots." *Id.* at 865. The *Hayashi* Court found nonetheless that "any diversion from eating off the fisherman's lines is not of the significance required for a 'taking' under the 'MMPA.'" *Id.* Similarly, Costello and Tepley's actions in the present case do not rise to the requisite level of intrusion required for violations of the MMPA.[9]

## IV. CONCLUSION

For the forgoing reasons, the Court finds that the ALJ's decision that Tepley's actions amounted to "harassment" under the MMPA was not based on substantial evidence.[10] The Court hereby GRANTS the plaintiff's motion for summary judgment and sets aside the agency decision pursuant to 5 U.S.C. § 706. Tepley has also requested that he be awarded his attorneys' fees and costs incurred in

9. The ALJ noted that "It is the characterization of the facts, not the facts themselves, which are in dispute in this case." A.R., tab 35, p. 5. Given that there was no evidence in the *Hayashi* case of the porpoise's reactions to the defendants' activities or of their emotional condition, the ALJ's undertaking here to evaluate the degree of annoyance experienced by the whales, by "characterizing" the facts in the case, goes beyond what is required by the case law.

10. Tepley also argues that the provisions of the Marine Mammal Protection Act and accompanying regulations are unconstitutionally vague as applied to his and Costello's actions. The Court does not decide this issue in light of the above findings.

defending the agency's action and bringing the complaint for judicial review on the grounds that the action was brought without "substantial justification" (Compl. at ¶ 8). That request is DENIED.

The Clerk shall close the file.

IT IS SO ORDERED.